*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0010p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

DONNA UHL, Individually and as Personal
Representative of the Estate of Lynn Uhl,
                              *Plaintiff - Appellee,*

                                                                        No. 07-1044
PACIFIC EMPLOYER'S INSURANCE COMPANY,
                              *Intervenor-Plaintiff-Appellee,*     >

        *v.*

KOMATSU FORKLIFT COMPANY, LTD.; KOMATSU
FORKLIFT, U.S.A., INC.,
                              *Defendants - Appellants.*

———————————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 04-10148—David M. Lawson, District Judge.

Argued: November 2, 2007

Decided and Filed: January 9, 2008

Before: SILER, MOORE, and GILMAN, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Fred J. Fresard, BOWMAN & BROOKE, Troy, Michigan, for Appellants. David R. Skinner, SKINNER PROFESSIONAL LAW CORP., Bay City, Michigan, for Appellee. **ON BRIEF:** Fred J. Fresard, BOWMAN & BROOKE, Troy, Michigan, for Appellants. David R. Skinner, SKINNER PROFESSIONAL LAW CORP., Bay City, Michigan, for Appellee.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge. In this case, the appellants challenge the validity of an arbitration award where one of the party-selected arbitrators had previously and occasionally served as co-counsel with the attorney representing the intervening plaintiff in the instant case. Because we conclude that this relationship did not violate the arbitration agreement or rise to the level of evident partiality, we **AFFIRM** the district court's judgment.

1

## I. BACKGROUND

On December 17, 2001, Lynn Uhl was using a forklift manufactured by the Komatsu Forklift Company[1] ("Komatsu") when the forklift allegedly "malfunctioned and failed resulting in severe injuries . . . which ultimately resulted in his death." Joint Appendix ("J.A.") at 16 (Compl. ¶ 4). This case is largely one of procedure and not substance; thus, the circumstances of, and Komatsu's influence on, the events that caused Lynn Uhl's death are not at issue in this appeal. Instead, this appeal concerns the fairness and equity of the legal wrangling that followed.

On June 21, 2004, Donna Uhl ("Uhl"), individually and as personal representative of the estate of Lynn Uhl, filed a tort action against Komatsu in the U.S. District Court for the Eastern District of Michigan. Shortly thereafter, the parties stipulated to Pacific Employer's Insurance Company's ("Pacific") intervention as a plaintiff. Attorney Roy Johnson ("Johnson") represented Pacific.[2]

After nearly a year of discovery, on November 8, 2005, the parties agreed to binding arbitration. As part of the parties' stipulation, they set a deadline of January 31, 2006, for the conclusion of the arbitration. Concurrent with the stipulation to use binding arbitration, the district court dismissed the case, although the district court retained jurisdiction until February 28, 2006, "to review and enforce or vacate any arbitral award." J.A. at 57-58 (Nov. 14, 2005, Order of Dismissal).

The parties, however, were unable to agree on an arbitration agreement that would govern the proposed arbitration, and each side blames the other for the failure. Regardless of the causes, by March 30, 2006, well after the deadline for arbitration, there was still no arbitration agreement among the parties, and Uhl and Pacific filed a motion to compel arbitration. In response, Komatsu argued that the district court no longer had jurisdiction over the case because the district court retained jurisdiction over the arbitration for only a limited (and expired) time frame, and for only a limited set of issues. The district court denied Uhl and Pacific's motion to compel arbitration, but reinstated the case to the active docket. On appeal the parties do not contest this ruling.

Discovery continued during the course of this protracted debate. On December 16, 2005, the parties deposed Peter Barroso ("Barroso"). Barroso later testified that, during his deposition, Fred Fresard ("Fresard"), counsel for Komatsu, noted to Johnson that he was aware that the plaintiffs were going to nominate Martin Stein ("Stein") as their party-selected arbitrator. Barroso also claims that Fresard indicated his awareness that Stein and Johnson had worked together on prior cases. Fresard does not dispute Barroso's statement but claims that Johnson told him only "that he had represented the intervening plaintiff in one or two cases in which Martin Stein represented the plaintiff." J.A. at 237 (Fresard Aff. ¶ 6). Fresard claims that Johnson never told him that Johnson and Stein had ever acted as co-counsel. J.A. at 238 (Fresard ¶ 7).

Only ten days after the district court reinstated the case to the active docket, the parties signed an arbitration agreement. The agreement provided for three arbitrators; each party would nominate one and the party-selected arbitrators would pick a third, neutral arbitrator. The agreement required that the party-selected arbitrators be "practicing attorney[s] possessing experience in

---

[1]Komatsu Forklift Company, a Japanese company, and Komatsu Forklift U.S.A., collectively the appellants, are both wholly-owned subsidiaries of Komatsu, Ltd. As such, we will treat them as one party.

[2]When Pacific first intervened, it was listed as "Liberty Mutual Insurance." However, for reasons unstated, it was subsequently listed as "Pacific Employer's Insurance Co." At all times Johnson was the intervening plaintiff's counsel.

judicial litigation, a substantial portion of which experience shall involve product liability matters." J.A. at 110 (Agreement ¶ 1). The agreement also imposed ethical constraints on the arbitrators:

> 2. *Ethical Requirements.* The Arbitrators shall have no financial or personal interest in the result of this Arbitration. Prior to selecting the neutral arbitrator, the party-selected arbitrators shall disclose to all parties any referral agreements, financial dealings, or other relationships with any of the parties or parties' attorneys that could in any way be construed as a possible conflict of interest. After such disclosure, either party may demand that the conflicted arbitrator recuse him/herself, and a new arbitrator will be selected by the party who originally selected the recused arbitrator.

J.A. at 110 (Agreement ¶ 2).

The arbitration agreement also imposed limits on the parties' post-award rights. The agreement stated that "[t]here can be no appeal from any decision made by the arbitrators except a claim of fraud or that the arbitrators, parties or their attorneys violated one of the provisions of this Agreement." J.A. at 111 (Agreement ¶ 7). Similarly, the agreement stated that "[t]he award shall be exclusive, final, and binding to all issues and claims that were raised or could have been raised in Plaintiff's and Defendants' respective pleadings," J.A. at 113 (Agreement ¶ 28), and that "the Arbitrators' award will be exclusive, final, and binding," J.A. at 114 (Agreement ¶ 33).

In mid-August 2006, the arbitration hearing began. Komatsu subsequently alleged that there were several incidents during the hearing that indicated bias on the part of Stein. First, Komatsu claims that a paralegal at the hearing overheard Stein tell the other arbitrators "[t]hat Fresard is a prick." J.A. at 252-53 (Dec. 7, 2007, Mot. to Enf. Award Hr'g Tr. at 12:23-13:5). Second, Komatsu claims that Stein closed his eyes during Komatsu's arguments and did not pay attention to its attorneys. Third, Komatsu claimed that Stein did not inspect the forklift with the other arbitrators until Komatsu's attorneys found him in the hotel. Fourth, Komatsu claimed that several evidentiary decisions by the panel of arbitrators were suspect and that Stein "always argued for the Plaintiffs' motion." J.A. at 256 (Hr'g at 16:2-23). Komatsu, however, did not object to any of these alleged events during the arbitration hearing.

After the hearing, while the parties waited for the arbitrators' decision, the parties stipulated to dismiss the tort-action lawsuit. In response, the district court dismissed the case with prejudice but once again retained jurisdiction "to review and enforce or vacate the arbitral award." J.A. at 121-22 (Aug. 30, 2006, Order of Dismissal).

On September 12, 2006, the arbitrators announced an award of $1.9 million for Uhl and Pacific. Komatsu claims that the size of the award provoked its suspicions, and it soon discovered that Stein and Johnson had a professional relationship that included at least two occasions when Stein and Johnson served together as co-counsel. On September 27, 2006, Komatsu filed a motion to vacate the arbitration award. Komatsu claimed, as it does here, that Stein's decision not to disclose his prior relationship with Johnson entitled Komatsu to rescission of the arbitration agreement. Komatsu also argued, as it does here, that Stein's decision not to disclose his prior relationship with Johnson was a violation of the Federal Arbitration Act ("FAA"), requiring the district court to vacate the award.

At a hearing to evaluate the motion to vacate, the district court questioned Johnson about the extent of his relationship with Stein. Johnson told the court that he never had a financial relationship with Stein, a referral fee with Stein, or used Stein as an arbitrator before the instant case. J.A. at 270 (Hr'g at 30:7-24).

On December 8, 2006, the district court confirmed the arbitration award and denied Komatsu's motion to vacate. The district court evaluated Stein's obligations under the FAA and concluded that Stein did not violate the FAA's provisions. In evaluating Stein's actions under the FAA, the district court applied a reasonable-person standard to conclude that there was no conflict of interest between Stein and Johnson. The district court further believed that Komatsu waived this argument by waiting until after the arbitration award was announced to object to Stein's alleged bias. The district court also evaluated the FAA provisions regarding fraud, procedural fairness, and the scope of the arbitrator's authority. The district court concluded that Komatsu failed to establish a violation under any of the FAA's provisions. On the same day, Komatsu appealed to this court.

Uhl and Pacific asked a motions panel of this court to dismiss Komatsu's appeal on the grounds that this court lacks jurisdiction. According to Uhl and Pacific, the arbitration agreement did not provide for review by the Sixth Circuit, and therefore, there is no jurisdiction to hear this appeal. The motions panel referred the matter to the hearing panel because "[t]he arguments raised in the motion to dismiss and the response in opposition go to the heart of the appeal." *Uhl v. Komatsu Forklift Co.*, No. 07-1044 (6th Cir. Mar. 12, 2007) (Order).

## II. JURISDICTION

It is incumbent upon us first to address the issue of whether we have jurisdiction to rule on this matter. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998). Uhl and Pacific contend that the arbitration agreement makes this case nonappealable beyond the district court. In particular, they point to the sections of the arbitration agreement that state that "[t]he award shall be exclusive, final, and binding to all issues and claims," J.A. at 113 (Agreement ¶ 28), and that "[t]he parties shall be deemed to have consented to the Arbitrators' judgment upon the receipt of the arbitration decision," J.A. at 114 (Agreement ¶ 30).

The question is whether that language is enough to strip this court of jurisdiction. Uhl and Pacific claim that *MACTEC, Inc. v. Gorelick*, 427 F.3d 821 (10th Cir. 2005), *cert. denied*, 547 U.S. 1040 (2006), interprets similar language as a waiver of appealability. *MACTEC* says nothing of the sort. In *MACTEC*, the Tenth Circuit demanded that any waiver of judicial review be "clear and unequivocal." *Id.* at 828 (internal quotation marks omitted). The *MACTEC* court specifically held that the "use of the term 'final' would not, by itself, be enough to convey an intent to eliminate appellate rights, [but] inclusion of the term 'nonappealable' serves this purpose." *Id.* at 830 (citation omitted).

Despite what Uhl and Pacific suggest, *MACTEC* supports our conclusion that we properly have jurisdiction. Nowhere in the arbitration agreement do the parties express the intent that the award will be nonappealable. Instead, the parties state that the award will be "final," and just as that was not enough for the Tenth Circuit, "final" without express language of nonappealability is not enough for this court either. We have previously found jurisdiction to hear an appeal of a district court's review of an arbitrator's decision when the arbitration agreement used very similar language that stated that "[t]he award of the arbitrator shall be considered final and binding." *Green v. Ameritech Corp.*, 200 F.3d 967, 970-974 (6th Cir. 2000). Furthermore, we have previously held in the context of a federal labor dispute that language that a decision was "final and binding on the parties, and further rights of appeal are hereby waived except that all articles must be in conformance with law and Executive Order" did not deprive us of jurisdiction because it preserved *some* appealability. *Dep't of the Air Force v. Fed. Labor Relations Auth.*, 775 F.2d 727, 733 (6th Cir. 1985). Our precedent, therefore, sets a high bar for the waiver of appealability.

We conclude that the arbitration agreement in the case at hand did not waive appealability. Not only does the arbitration agreement say nothing that expresses a desire to waive appealability, but even the language that made the award "final" was tempered by a commitment to future judicial

intervention. The agreement stated that the district court "shall retain jurisdiction of this matter for the purpose of . . . enforcing any award entered by the Arbitrators." J.A. at 114 (Agreement ¶ 36). Uhl and Pacific's brief concedes that this language provides a basis for judicial review for "a claim of fraud or a violation of the arbitration agreement." Appellees Br. at 5. Furthermore, the parties' own actions suggest that they accepted a greater judicial role than Uhl and Pacific now admit; after the arbitration was complete, the parties filed a stipulation for dismissal that directed the district court to "retain jurisdiction to settle *any* dispute between the parties regarding the enforcement of the Arbitration Award." J.A. 119-20 (Stip. to Dismiss) (emphasis added). In response to the stipulation, the district court retained jurisdiction "to review and enforce or vacate the arbitral award." J.A. at 121-22 (Dismissal). Thus, the language of finality is tempered by an active role for the district court and, in the absence of language that would limit appeals to no higher than the district court, we cannot say that this was a clear waiver of appealability.

Given that there was no waiver of appealability, we apply the usual rule that arbitration agreements are generally appealable. *See* 9 U.S.C. § 16; MICH. CT. RULE 3.602(N) ("Appeals may be taken as from order[s] or judgments in other civil actions."). Accordingly, we conclude that we have jurisdiction to hear the appeal under 28 U.S.C. § 1291 as a standard appeal from the final decision of a district court.

## III. GOVERNING LAW

Before addressing the merits of this case, we must determine the law that governs our review. On appeal, Komatsu presents two different types of arguments: (1) a Michigan contract-law argument and (2) an argument based on the FAA. These two arguments are governed by two different sets of law.

When considering Komatsu's contract-law argument, "[b]ecause we are sitting in diversity, we apply the law, including the choice of law rules, of the forum state." *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003) (footnote and citation omitted). In this case, the forum state is Michigan, so we must apply the law that Michigan would apply when interpreting the arbitration agreement.

"The predominant view in Michigan has been that a contract is to be construed according to the law of the place where the contract was entered into." *Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 528 N.W.2d 698, 702 (Mich. 1995) (footnote omitted). However, that rule changed when the Michigan Supreme Court noted that "[t]he trend in this Court has been to move away from traditional choice-of-law conceptions toward a more policy-centered approach." *Id.* (footnote omitted). In *Chrysler*, the Michigan Supreme Court endorsed the approach found in the Restatement (Second) of Conflict of Laws; therefore, Michigan courts "balance the expectations of the parties to a contract with the interests of the states involved to determine which state's law to apply." *Mill's Pride, Inc. v. Cont'l Ins. Co.*, 300 F.3d 701, 705 (6th Cir. 2002) (quotation marks omitted) (quoting *Equitable Life Assurance Soc'y of the U.S. v. Poe*, 143 F.3d 1013, 1016 (6th Cir.1998)). According to the Restatement approach:

> In the absence of an effective choice of law by the parties . . . , the contacts to be
> taken into account . . . to determine the law applicable to an issue include:
> (a)  the place of contracting,
> (b)  the place of negotiation of the contract,
> (c)  the place of performance,
> (d)  the location of the subject matter of the contract, and
> (e)  the domicil, residence, nationality, place of incorporation and place of
>      business of the parties.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(2) (1971).

In the case at hand, the arbitration agreement does not contain a choice-of-law provision to select the law that governs interpretation of the arbitration agreement. Thus, we apply the Restatement approach and we conclude that all five of the Restatement elements point toward Michigan law, so we will apply Michigan contract law when interpreting the arbitration agreement.

Although the agreement does not contain a choice-of-law provision, the agreement does contain a provision that establishes the default rules governing the arbitration itself: "The proceeding under this Agreement shall be deemed an arbitration proceeding subject to the Michigan Arbitration Act, MCL 600.5001 et seq., the Federal Arbitration Act, 9 USC 1 et seq., and MCR 3.602." J.A. at 114 (Agreement ¶ 29). Typically, the FAA would not apply to this arbitration agreement. "While the FAA applies to a broad scope of cases in federal courts, it does not apply to all. The FAA applies only to written arbitration provisions in 'contract[s] evidencing a transaction involving commerce' and 'maritime transactions.'" *Brown v. Hyatt Corp.*, 128 F. Supp. 2d 697, 700 (D. Haw. 2000) (quoting 9 U.S.C. § 2) (holding that an arbitration agreement entered into after a tort occurred is not governed by the FAA). However, because the parties invoked the FAA in the arbitration agreement and rely heavily upon cases applying the FAA, we also will construe the parties' obligations with respect to the FAA. In addition, although the clause in the arbitration agreement also mentions Michigan law, Michigan's arbitration law is almost identical to the FAA in all relevant respects. *Compare* MICH. CT. RULE 3.602(J)(1)(b), *with* 9 U.S.C. § 10. Thus, we will consider Komatsu's FAA claims and the parties' default obligations with respect to our caselaw interpreting the FAA.

## IV. ARBITRATOR STEIN'S OBLIGATIONS

### A. Contract-Law Argument

#### 1. Standard of Review

"When reviewing a district court's decision to confirm or vacate an arbitration award, we review factual findings for clear error and questions of law de novo." *Green*, 200 F.3d at 974; *see also Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 429 F.3d 640, 643 (6th Cir. 2005) ("*Nationwide IV*"); *Int'l Bhd. of Teamsters, Local 519 v. United Parcel Serv., Inc.*, 335 F.3d 497, 503 (6th Cir. 2003).

#### 2. Overview

The first of Komatsu's arguments is that the arbitration agreement itself was violated when Stein failed to disclose his prior relationship with Johnson. The exact provision of the agreement in question reads:

> 2. *Ethical Requirements.* The Arbitrators shall have no financial or personal interest in the result of this Arbitration. Prior to selecting the neutral arbitrator, the party-selected arbitrators *shall disclose* to all parties *any* referral agreements, financial dealings, or other relationships with any of the parties or parties' attorneys that could in any way be construed as a possible conflict of interest. After such disclosure, either party may demand that the conflicted arbitrator recuse him/herself, and a new arbitrator will be selected by the party who originally selected the recused arbitrator.

J.A. at 110 (Agreement ¶ 2) (emphases added). According to Komatsu, this provision gives the arbitrator no choice as to whether to disclose past relationships; the arbitrator must disclose anything that could be construed as a conflict of interest. In contrast, Uhl and Pacific appear to believe that

the first sentence of the paragraph serves to limit the scope of rest of the paragraph, thus requiring disclosures only of those things that would suggest a financial or personal interest in the result of the arbitration.

According to Komatsu, when Stein failed to disclose his relationship with Johnson, Komatsu was entitled to rescission of the entire arbitration agreement on the basis of fraud in the inducement. Komatsu made this same argument to the district court in Komatsu's motion to vacate, but the district court did not explicitly address it. In the course of addressing Komatsu's FAA argument, however, the district court stated that "there was no obligation on Stein's part to make the disclosures suggested by the defendants under the plain language of the arbitration agreement." J.A. at 37 (Op. at 13). It is therefore apparent that the district court sided with Uhl and Pacific in interpreting this provision of the arbitration agreement.

A party must typically request vacation under the FAA, rather than try to attack an arbitration agreement through breach-of-contract claims. *Decker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 205 F.3d 906, 908 (6th Cir. 2000) (calling a breach-of-contract claim an impermissible collateral attack and stating that "the FAA provides the exclusive remedy for challenging acts that taint an arbitration award"); *Corey v. New York Stock Exch.*, 691 F.2d 1205, 1211-12 (6th Cir. 1982). However, a litigant can attack the contract itself if "there was any defect in the underlying agreement to arbitrate the dispute." *Corey*, 691 F.2d at 1212. Komatsu alleges that Stein's failure to disclose his relationship with Johnson was such a defect and that Komtasu is therefore entitled to challenge the validity of the arbitration agreement. Although we agree that Komatsu can challenge the arbitration agreement, we conclude that Komatsu's challenge falls short.

### 3. Rescission and Fraud in the Inducement

We need not resolve the parties' dispute regarding the correct interpretation of Paragraph 2 of the arbitration agreement because we conclude that Komatsu is requesting a form of relief to which it is not entitled even if its interpretation is correct. According to Michigan law, an arbitration agreement "shall be valid, enforceable and irrevocable save upon such grounds as exist at law or in equity for the rescission or revocation of any contract." MICH. COMP. LAWS § 600.5001(2). Komatsu claims that it is entitled to rescission on the ground of fraud in the inducement. Parties are entitled to bring a fraud-in-the-inducement action when they are induced into entering an agreement on the basis of false representations. *See Rood v. Midwest Matrix Mart, Inc.*, 87 N.W.2d 186, 190 (Mich. 1957) (distinguishing between fraud in the inducement and fraud in the execution). To establish successfully a claim for fraud in the inducement, Komatsu would need to establish six things:

> (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage.

*Custom Data Solutions, Inc. v. Preferred Capital, Inc.*, 733 N.W.2d 102, 105 (Mich. Ct. App. 2006) (internal quotation marks omitted).

We conclude that Komatsu cannot establish fraud in the inducement. The Michigan Court of Appeals has emphasized that fraud in the inducement is not available for a breach of a contract's terms, lest fraud in the inducement claims swallow all breach-of-contract claims: "[A] claim of fraud in the inducement, by definition, redresses misrepresentations that induce the buyer to enter into a contract *but that do not in themselves* constitute contract or warranty terms subsequently breached by the seller." *Huron Tool and Eng'g Co. v. Precision Consulting Servs., Inc.*, 532

N.W.2d 541, 546 (Mich. Ct. App. 1995) (emphasis added). Komatsu claims that the arbitration agreement required a disclosure that Stein did not make, and Komatsu is, therefore, asking us to find fraud in the inducement where a party simply failed to uphold its side of the bargain. We cannot hold that this constitutes fraud in the inducement without turning *every* breach-of-contract claim into a claim for fraud in the inducement, because every party enters into an agreement with the expectation that all parties will abide by the agreement's terms. This is, therefore, a compelling reason to deny Komatsu eligibility for rescission.

Furthermore, even if Komatsu's argument did not swallow all breach-of-contract claims in contravention of Michigan precedent, it would still be hard to see how the agreement was a misrepresentation that could trigger rescission. As *Custom Data Solutions* states, a valid fraud-in-the-inducement claim requires a "representation." 733 N.W. 2d at 105. While the arbitration agreement states that the arbitrators will disclose conflicts of interest, it does not warrant or represent that any one arbitrator is free of conflicts. While perhaps Komatsu might have been able to sustain a breach-of-contract claim,[3] it most certainly cannot now claim that it was induced by the simple fact that an agreement existed.

## B. FAA Argument

### 1. Standard of Review

As before, "[w]hen reviewing a district court's decision to confirm or vacate an arbitration award, we review factual findings for clear error and questions of law de novo." *Green*, 200 F.3d at 974. In addition, in the context of the FAA, our ability to reverse judgments is restricted even further: "The Federal Arbitration Act ("FAA") expresses a presumption that arbitration awards will be confirmed." *Nationwide IV*, 429 F.3d at 643. "'When courts are called on to review an arbitrator's decision, the review is very narrow; [it is] one of the narrowest standards of judicial review in all of American jurisprudence.'" *Id.* (quoting *Lattimer-Stevens Co. v. United Steelworkers*, 913 F.2d 1166, 1169 (6th Cir.1990)).

### 2. Evident Partiality

In addition to its contract-law claim, Komatsu argues that we should vacate the arbitration award because Stein's relationship with Johnson was "evident partiality" in violation of the FAA. "A federal court may set aside an arbitration award under the FAA only upon a finding that certain statutory or judicial grounds are present." *The Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 328 (6th Cir. 1998). Those statutory grounds are:

   (a)  In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—
      (1)  where the award was procured by corruption, fraud, or undue means;
      (2)  where there was evident partiality or corruption in the arbitrators, or either of them;

---

[3]We are skeptical that Komatsu could prevail even in a breach-of-contract action given that it is uncontroverted that Komatsu knew before it signed the agreement that Uhl and Pacific were going to choose Stein and that Johnson and Stein had previously worked together. Furthermore, at any point Komatsu could have requested that the arbitrators disclose conflicts in accordance with the agreement. Thus, Komatsu was aware of the basic facts of the potential conflict and had it within its power to avoid any harm from a breach of contract. *See Carter v. State Farm Mut. Auto. Ins. Co.*, 87 N.W.2d 105, 109 (Mich. 1957) (noting Michigan's requirement that a party take action to mitigate potential losses from a breach of contract).

> (3)  where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4)  where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10.  Although there are four statutory grounds for vacating an award, and although the district court addressed all four, Komatsu now raises claims only with respect to evident partiality. *See* Appellants Br. at 31 ("[T]he arbitration award should have been vacated pursuant to 9 U.S.C. § 10(a)(2)."); *id.* at 26-28 (criticizing the district court for applying § 10(a)(4) when Komatsu had never raised § 10(a)(4) as grounds for vacating).  We therefore consider only whether Stein's relationship with Johnson constituted evident partiality in violation of the FAA, and we do not consider any other statutory factors.

Komatsu, in arguing that Stein's relationship with Johnson constituted evident partiality, relies heavily upon *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145 (1968), wherein Justice Black wrote that arbitrators "must avoid even the appearance of bias." *Id.* at 150.  Komatsu's reliance on this case, however, is misplaced.  Although Justice Black's meaning can hardly be questioned, that was not the standard that prevailed in this circuit.  Instead, it was Justice White's narrower concurring opinion that gained traction.  Justice White did not consider all conflicts created equal; he separated those disclosures that were important from those that were insignificant.  Justice White wrote that "arbitrators are not automatically disqualified by a business relationship with the parties before them if both parties are informed of the relationship in advance, or if they are unaware of the facts but the relationship is trivial."  *Id.* (White, J., concurring) (agreeing with the majority that the neutral arbitrator's relationship should have been disclosed).  As the Fifth Circuit recently described, Justice White's "opinion fully envisions upholding awards when arbitrators fail to disclose insubstantial relationships." *Positive Software Solutions, Inc. v. New Century Mortgage Corp.*, 476 F.3d 278, 281-82 (5th Cir.), *cert. denied*, ___ U.S. ___, 127 S. Ct. 2943 (2007).

We have adopted Justice White's more nuanced view that not every nondisclosure violates the FAA.  We have held that "the challenging party must show that 'a reasonable person would have to conclude that an arbitrator was partial' to the other party to the arbitration." *Apperson v. Fleet Carrier Corp.*, 879 F.2d 1344, 1358 (6th Cir. 1989) (quoting *Morelite Const. Corp. v. New York City Dist. Council Carpenters Benefit Fund*, 748 F.2d 79, 84 (2d Cir.1984)), *cert. denied*, 495 U.S. 947 (1990); *see also Nationwide IV*, 429 F.3d at 645; *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 278 F.3d 621, 626 (6th Cir. 2002) ("*Nationwide II*").  In order to sustain that burden, "the party asserting evident partiality must establish specific facts that indicate improper motives on the part of the arbitrator." *Andersons*, 166 F.3d at 329 (internal quotation marks omitted) (quoting *Consolidation Coal Co. v. Local 1643, United Mine Workers*, 48 F.3d 125, 129 (4th Cir.1995)).  It is not enough to demonstrate "an amorphous institutional predisposition toward the other side," because that would simply be the appearance-of-bias standard that we have previously rejected. *Id.*

Thus, the question is whether Komatsu has sustained its burden to establish "specific facts that indicate improper motives on the part of the arbitrator." *Id.*  We conclude that it has not.  What Komatsu has established is that several years earlier Stein and Johnson were co-counsel on two cases and that on six other cases Stein represented the plaintiff while Johnson represented the intervening plaintiff.  While we cannot say that such a relationship would never give rise to evident partiality, the facts in the record before us indicate that a reasonable person would not be forced to conclude that Stein was partial toward Uhl and Pacific.

There are several reasons why Komatsu has failed to establish evident partiality. First, despite Komatsu's repeated assertions that there must have been a financial arrangement between Johnson and Stein, Johnson denied that in court and Komatsu has provided no evidence of a financial agreement. Second, despite Komatsu's repeated assertions that there is an ongoing relationship between Johnson and Stein, Komatsu has adduced no probative evidence. Lastly, this court and others have declined to vacate under similar circumstances. For instance, when an arbitrator adjudicated a case that involved his former law partners (whose practice he had left two-and-a-half years earlier), we declined to vacate in the absence of evidence of a personal interest in the arbitration or prior knowledge of the substance of the arbitration. *See Apperson*, 879 F.2d at 1360. More recently, we held that a reasonable person would not be required to conclude that the arbitrator was partial when the arbitrator disclosed that he had served as an arbitrator for one defendant six times and as an arbitrator for another defendant over twenty times. *See Nationwide IV*, 429 F.3d at 647-48. Most analogous to the instant case, the Fifth Circuit called it a "trivial former business relationship" when an arbitrator had previously acted as co-counsel in another matter with one of the attorneys representing a party to the arbitration. *Positive Software Solutions*, 476 F.3d at 283-84.

Of course, Komatsu alleged more than simply the relationship itself; Komatsu also claims to have evidence of Stein's antagonistic behavior during the hearing. Komatsu, however, did not object during the hearing to the alleged behavior, so it is difficult to accord any weight to Komatsu's uncorroborated claims. Thus, we conclude on the basis of the facts before us that the relationship between Stein and Johnson was not significant enough to rise to the level of evident partiality.

In its briefs, Komatsu attempts to distinguish *Nationwide IV* from the instant case, but these arguments are unavailing. Komatsu claims that two important facts distinguish *Nationwide IV*: first, in *Nationwide IV*, the arbitrator disclosed his relationships; and second, *Nationwide IV* did not involve a contractual disclosure provision. The fact that *Nationwide IV* involved disclosure, whereas this case involved nondisclosure, is not a significant difference; according to Justice White and our own precedent, there is no duty to disclose if the relationship is trivial. The above discussion establishes that the relationship between Stein and Johnson was insignificant; therefore, whether Stein disclosed the relationship or not, he was under no obligation to do so. Similarly, the fact that the case at hand involves a contractual provision is equally unimportant. The contractual provision provides separate and independent obligations that we have already addressed, while the FAA regulates disclosure on its own terms. Thus, the contractual provision does not alter the parties' rights and obligations as they are dictated by the FAA.

We will not rush to conclude that an arbitrator is evidently partial. Arbitrators are often chosen for their expertise and community involvement, *Nationwide IV*, 429 F.3d at 646, so "[t]o disqualify any arbitrator who had professional dealings with one of the parties (to say nothing of a social acquaintanceship) would make it impossible, in some circumstances, to find a qualified arbitrator at all." *Id.* at 647 (internal quotation marks omitted) (quoting *Morelite Const. Corp.*, 748 F.2d at 83). In this case, the parties specifically contracted for arbitrators with experience in products liability actions, J.A. at 110 (Agreement ¶ 1), and while we cannot say how large that pool of arbitrators would be, if a relationship as insignificant as the one in this case were enough to trigger evident partiality, it would make it much harder to find arbitrators with the relevant and necessary expertise. For these reasons, we conclude that Komatsu has not established evident partiality.

## V. DISCOVERY AND SANCTIONS

### A. Additional Discovery

Komatsu asks us to reverse the district court's denial of Komatsu's request for additional

discovery if we deny its other claims. In *Nationwide II*, the defendant requested additional discovery in order to depose two of the arbitrators so that the defendant could uncover evidence of arbitral bias. We reviewed the district court's denial under an abuse-of-discretion standard. *Nationwide II*, 278 F.3d at 628. In *Nationwide II*, we were ambiguous as to whether the party seeking additional discovery must offer clear evidence of improper conduct or simply establish that a reasonable person would have to conclude that an arbitrator was partial, but we concluded that under either standard no additional discovery was warranted. *Id.*

Here too, Komatsu does not merit additional time for discovery under either standard. Komatsu has provided no evidence either of improper conduct or that a reasonable person would have to conclude that Stein was partial. Furthermore, it would be excessive to grant additional discovery when Komatsu first identified the relationship between Stein and Johnson at the end of August 2006, and now, more than a year later, has still not provided any additional information that would establish an improper relationship. We therefore deny any additional time for discovery.

## B. Sanctions

Uhl and Pacific have requested sanctions for a frivolous appeal under Federal Rule of Appellate Procedure 38. Their request was properly made in a separately filed motion. *See* FED. R. APP. P. 38; Appellees Mot. for Dismissal at 19. We have held that an appeal may be frivolous where "it is obviously without merit *and* is prosecuted for delay, harassment, or other improper purposes." *Barney v. Holzer Clinic, Ltd.*, 110 F.3d 1207, 1212 (6th Cir. 1997) (internal quotation marks omitted) (quoting *NLRB v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 591 (6th Cir. 1987)).

In *Barney*, we denied sanctions because there was no evidence of "some improper purpose, such as harassment or delay, behind the appeal." *Id.* Similarly, we decline to impose sanctions here. While Komatsu's case may indeed be quite weak, neither Uhl nor Pacific have presented any evidence that there was some improper purpose. Given the lack of any evidence establishing an improper purpose and in light of the arbitration agreement's possible ambiguities, we decline to impose sanctions in this case.

## VI. CONCLUSION

For the foregoing reasons, we **DENY** Uhl and Pacific's motion to dismiss, **DENY** Uhl and Pacific's motion for sanctions, **AFFIRM** the district court's confirmation of the arbitration award, and **AFFIRM** the district court's denial of Komatsu's motion to vacate the arbitration award.