**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0124n.06

**No. 09-2317**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Feb 23, 2011**
LEONARD GREEN, Clerk

PROFESSIONAL CONSULTATION SERVICES INCORPORATED, dba PCS-GLOBAL, et al.,

      Plaintiffs-Appellants,

v.

SCHAEFER & STROHMINGER INCORPORATED, et al.,

      Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

Before:  ROGERS, SUTTON and McKEAGUE, Circuit Judges.

SUTTON, Circuit Judge.  Professional Consultation Services (PCS-Global) and its owners have sued Schaefer & Strohminger (S&S) and its subsidiaries three times now:  first in federal court in Maryland; then in state court in Maryland; and most recently in federal court in Michigan. Although the three complaints are not identical, they each arise from a multi-year contractual relationship between PCS-Global and S&S that went south.  The district court dismissed the most recent of these complaints with prejudice, holding that some of the counts failed to state a claim, others were time-barred and still others were barred on *res judicata* grounds.  We affirm.

No. 09-2317
*Prof'l Consultation Servs., Inc. v. Schaefer & Strohminger, Inc.*

I.

PCS-Global is a Michigan-based corporation that provides consulting services to businesses in the automotive industry. For over twenty years, PCS-Global had its headquarters at the Carriage House Inn, a 127-acre retreat center in Harrison, Michigan. S&S is a Maryland-based corporation that manages several automobile dealerships and a boat dealership in the Baltimore area.

In March 2002, S&S hired PCS-Global to "provide . . . evaluative, training & consulting services," and the parties signed two "letters of agreement" under which S&S would make periodic payments totaling nearly $1.2 million. R.1, Ex.1. Over the next year, the parties reassessed their relationship several times. By January 2003, they reached a deal far afield from the original services contracts: PCS-Global agreed to sell the Carriage House Inn to S&S in exchange for two promissory notes totaling $2.5 million, a yacht worth $275,000 and a promise that Connie Milnarcik, a co-owner of PCS-Global, would manage the Pintail Point Resort, owned and operated by S&S in Maryland. The deal closed on August 25, 2003.

Throughout this contractual relationship, S&S allegedly did not hold up its end of the bargain, as PCS-Global attempted to establish in a series of lawsuits. On July 18, 2007, PCS-Global filed a lawsuit in the United States District Court for the District of Maryland. *See Prof'l Consultation Servs., Inc. v. Schaefer & Strohminger, Inc.*, No. JFM-07-1917 (*Prof'l Consultation I*). The complaint raised one claim under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq*., and several state common law claims. On November 2, 2007,

No. 09-2317
*Prof'l Consultation Servs., Inc. v. Schaefer & Strohminger, Inc.*

PCS-Global filed a second action in the Maryland Circuit Court for Baltimore County, *see Prof'l Consultation Servs., Inc. v. Schaefer & Strohminger, Inc.*, No. 03-C-07-012657CN (*Prof'l Consultation II*), again raising one claim under RICO and several Maryland common law claims. A few months later, the Maryland federal court dismissed the RICO claim with prejudice and the remaining claims without prejudice. *See Prof'l Consultation I*, 2008 WL 544837 (D. Md. Feb. 26, 2008). PCS-Global did not appeal the dismissal.

PCS-Global filed this action, the third one, in the United States District Court for the Eastern District of Michigan on July 7, 2008. In addition to the claims raised earlier, PCS-Global filed three new claims: silent fraud under Michigan common law, fraudulent transfer under Mich. Comp. Laws § 566.34 and statutory conversion under Mich. Comp. Laws § 600.2919a.

On July 15, 2009, the Maryland state court dismissed most of PCS-Global's claims with prejudice, and it dismissed four of them without prejudice: quantum meruit (restitution for PCS-Global's services), conversion (for failing to turn over the yacht), breach of contract (for violating the first "letter of agreement") and breach of contract (for violating the second "letter of agreement").

Later in 2009, the Michigan federal court dismissed all of the claims before it with prejudice. The court ruled that *res judicata* barred the silent fraud claim because PCS-Global could, and should, have raised the claim in the Maryland state court action, and the Michigan federal court ruled that PCS-Global failed to state a claim of fraudulent transfer under Mich. Comp. Laws § 566.34. The court dismissed the remaining claims on statute-of-limitations grounds. PCS-Global appeals.

No. 09-2317
*Prof'l Consultation Servs., Inc. v. Schaefer & Strohminger, Inc.*

II.

A.

The parties agree that Michigan choice-of-law rules, *see Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 528 N.W.2d 698 (Mich. 1995), control which statute of limitations—Maryland's (three years) or Michigan's (six years)—applies to the quantum meruit and breach of contract claims. They disagree about how to apply the Michigan test.

In *Chrysler*, the Michigan Supreme Court generally endorsed the choice-of-law test in the Restatement (Second) of Conflict of Laws. *Id.* at 703; *see Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 302 (6th Cir. 2008). When a contract does not express a choice of law, the court should consider several factors in order to "balance the expectations of the parties . . . with the interests of the states involved," *Uhl*, 512 F.3d at 302, including "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil[e], residence, nationality, place of incorporation and place of business of the parties," Restatement (Second) of Conflict of Laws § 188(2). When the contract concerns "the rendition of services," the governing law is typically "the local law of the state where the contract requires that the services, or a major portion of the services, be rendered, unless . . . some other state has a more significant relationship . . . to the transaction and the parties." *Id.* § 196. On balance, these considerations favor Maryland law.

- 4 -

*The place of contracting*. What matters here is where "the last act necessary . . . to give the contract binding effect" took place. *Id.* § 188 cmt. e. Neither party clearly explains where this was, and the record suggests only that PCS-Global faxed the "letters of agreement" to S&S for a final signature, presumably in Maryland, where S&S is based. Because this feature of the transaction strikes us as a "relatively insignificant contact," *id.*, and because the record fails to clarify precisely where this last act occurred, we give this consideration no weight in the inquiry.

*The place of negotiation*. It likewise appears that "there is no one single place of negotiation and agreement," as the parties "conduct[ed] their negotiations from separate states by mail or telephone." *Id*. Therefore, this factor does not favor either State. *See id.*; *Kipin Indus., Inc. v. Van Deilen Int'l, Inc.*, 182 F.3d 490, 496 (6th Cir. 1999).

*The place of performance*. The place of performance, it seems to us, plays first violin in this case. PCS-Global does not dispute that it was expected to perform—and did perform—most of its consulting services in Maryland. The "letters of agreement" and the quantum meruit claim all focus on these services. Whether viewed from the perspective of "the expectations of the parties" or "the interests of the states involved," *Uhl*, 512 F.3d at 302, the place of performance favors Maryland. In performing the contract, PCS-Global employees traveled frequently to the Baltimore area and eventually contemplated moving the business there. All of this gives Maryland a strong interest in the contract's performance.

PCS-Global attempts to counter this conclusion by invoking the HUD-1 Settlement Statement executed on September 5, 2003. As the company sees it, this form "embodied—or re-embodied—the affairs of the parties." Oral Arg. at 1:57. But the sale of the Carriage House Inn, which prompted the execution of the HUD-1, came more than a year after the "letters of agreement" went into effect, and the Maryland state court has already rejected the claims related to that sale. Whatever the effect of the HUD-1 form on those claims, it does not change Michigan's interest in the original services contracts, which called for services that would be performed primarily in Maryland.

*The location of the subject matter of the contract*. This factor matters most when a contract "deals with a specific physical thing . . . or affords protection against a localized risk." Restatement (Second) of Conflict of Laws § 188 cmt. e. The relevant physical things here—the Inn and the yacht—did not come into play until after the "letters of agreement" went into effect, and to the extent those agreements concerned a "subject matter," it was the services to be performed in Maryland. The factor thus deserves little weight, even though it modestly favors Maryland law.

*The domicile, residence, nationality, place of incorporation and place of business of the parties*. PCS-Global is based in Michigan, and S&S is based in Maryland. This factor is a wash.

In view of the balance of the § 188 factors and in view of the "presumption" in favor of the law of the State where the contractual performance occurs, *Kipin Indus.*, 182 F.3d at 496, the scales

tip east—to the law of Maryland.  That means Maryland's three-year limitations period applies and, it follows, the quantum meruit and breach of contract claims are time-barred.

Our decision in *Kipin Industries* points in the same direction.  There, we applied Michigan choice-of-law rules to a contract between a resident of Michigan and a resident of Pennsylvania.  *Id*. The contract concerned services to be performed in Kentucky.  *Id*.  After determining that the contract's express choice-of-law provision was partially invalid, we applied § 188 and § 196 of the Restatement.  *Id*.  Even though the place of contracting was Michigan, we concluded that "no state ha[d] a more significant relationship to the contract than . . . Kentucky."  *Id*.  So too here for Maryland.

PCS-Global objects that the district court, in reaching the same conclusion, improperly held against it the fact that its Maryland state court action identified the common law claims as arising "under the common law of Maryland."  R.3, Ex. C at 4.  The choice of Maryland as a *forum*, PCS-Global claims, could well have been motivated by considerations that have nothing to do with the appropriate choice of law.  True enough, but PCS-Global did more than choose Maryland as a forum; it said that the claims arose "under the common law of Maryland."  We see no reason why the wording of PCS-Global's state court complaint cannot serve as circumstantial evidence of "the expectations of the parties," a relevant component of the choice-of-law analysis.  *Uhl*, 512 F.3d at 302.  The point, at all events, matters little here, as we have not invoked this consideration in our choice-of-law analysis.

B.

The district court also properly dismissed PCS-Global's conversion claims. As to these claims, the company does not dispute that a three-year limitations period applies, even under Michigan law. Instead, PCS-Global contends that these claims did not accrue until March 7, 2006, when S&S said that it would "relinquish[]" the yacht as part of a settlement offer. According to PCS-Global, "the Parties were of one mind that PCS owned the yacht as of that date." PCS-Global Br. at 18.

Yet the relevant question is "when dominion [was] wrongfully asserted over" the personal property at issue. *Davidson v. Bugbee*, 575 N.W.2d 574, 576 (Mich. Ct. App. 1997); *see Thoma v. Tracy Motor Sales, Inc.*, 104 N.W.2d 360, 362 (Mich. 1960). According to PCS-Global's own complaint, "[t]he extent and duration of the defendants' exercise of dominion and control over the plaintiffs' yacht has been more than three years." R.1 ¶ 151. Plus, "possession of the yacht was to take place immediately . . . on September 5, 2003, and complete title transfer of the yacht . . . was to occur immediately on January 1, 2005." *Id.* ¶ 148. At the latest, the conversion claim thus accrued on January 1, 2005, when S&S had not transferred possession or title, as the contract required, which was more than three years before PCS-Global filed the complaint in this case on July 7, 2008.

III.

For these reasons, we affirm.