RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0087p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

THOMAS KINKADE COMPANY, fka Media Arts
Group, Incorporated; RICHARD F. BARNETT,
     *Plaintiffs-Appellees*,

   *v.*

NANCY WHITE; DAVID WHITE; LIGHTHOUSE
GALLERIES, LLC,

    *Defendants-Appellants.*

No. 10-1634

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:09-cv-10757—Patrick J. Duggan, District Judge.

Argued: July 27, 2012

Decided and Filed: April 2, 2013

Before: ROGERS and KETHLEDGE, Circuit Judges; MARBLEY, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Steven Z. Cohen, COHEN, LERNER, RABINOVITZ & WITUS, P.C.,
Royal Oak, Michigan, for Appellants. Dana N. Levitt, ZUBER & TAILLIEU LLP, Los
Angeles, California, for Appellees. **ON BRIEF:** Steven Z. Cohen, COHEN, LERNER,
RABINOVITZ & WITUS, P.C., Royal Oak, Michigan, for Appellants. Dana N. Levitt,
ZUBER & TAILLIEU LLP, Los Angeles, California, for Appellees.

_____

## OPINION
_____

KETHLEDGE, Circuit Judge. In this case the coincidences all break one way.

Mark Kowalsky was a purportedly neutral arbitrator in a dispute between the Kinkade

---

[*] The Honorable Algenon L. Marbley, United States District Judge for the Southern District of
Ohio, sitting by designation.

1

Company and Nancy and David White.  Nearly five years and nearly 50 hearing days into their arbitration, however, Kowalsky announced to Kinkade that its adversary, David White, and the Whites' advocate on the arbitration panel, Mayer Morganroth, had each hired Kowalsky's firm for engagements that were likely to be substantial.  Kinkade objected, to no avail.  A series of irregularities in the arbitration followed, all of which favored the Whites.  Kowalsky eventually entered a $1.4 million award in the Whites' favor.  The district court vacated the award on grounds of Kowalsky's "evident partiality."  We affirm the district court.

I.

In the late 1990s, Kinkade and the Whites entered into several agreements under which the Whites agreed to be "Signature dealers" of Kinkade's artwork.  The parties agreed to arbitrate any disputes between them "in accordance with the Commercial Arbitration Rules of the American Arbitration Association."  Soon the parties put that clause to use:  in 2002, they commenced an arbitration in which Kinkade claimed that the Whites had not paid for artwork worth hundreds of thousands of dollars, and the Whites counterclaimed that they had been fraudulently induced to enter into the dealer agreements.

Per the arbitration rules, each party was entitled to appoint one arbitrator, who would *de facto* advocate that party's position on the panel.  *See generally Bhd. of Maint. of Way Emps. v. Terminal R.R. Ass'n*, 307 F.3d 737, 739 (8th Cir. 2002).  Kinkade chose Burton Ansell as its arbitrator; the Whites chose Mayer Morganroth as theirs.  Together Ansell and Morganroth chose Mark Kowalsky as the panel's neutral arbitrator, who would chair the panel and *de facto* decide the issues in the arbitration.

The arbitration itself was a model of how not to conduct one.  The least of its blemishes was that it dragged on for years.  In January 2006, Kinkade's counsel discovered that the Whites' counsel, Joseph Ejbeh of "the Yatooma firm" in Michigan, had been surreptitiously sending a live feed of the hearing transcripts to a hotel room miles away.  There, a disgruntled former Kinkade employee, Terry Sheppard, would review the transcripts in real-time and send proposed cross-examination questions to

Ejbeh via instant messages. This scheme went on for more than a year. When the panel finally confronted Ejbeh about it, he at first denied the scheme, but then admitted it "[a]fter additional inquiry by the arbitrators and an outburst of crying from the court reporter[.]" D. Ct. Op. at 4. The Yatooma firm then replaced Ejbeh with Edward Fisher, but he departed after being convicted of federal tax fraud. A third Yatooma lawyer, Robert Zawideh, took his place.

Meanwhile, Kinkade sent discovery requests for "all documents" supporting the Whites' damages claim, including all of their financial records. The Whites produced virtually nothing in response, and said that "[e]xpert testimony and reports will provide additional information on the more precise calculation of damages." That turned out to be an overstatement: the Whites' expert based his damages calculations merely upon *pro formas* that the Whites had prepared prior to entering the dealer agreement, rather than upon financial records from actual operations; and the expert offered no opinion at all as to how Kinkade's conduct (as opposed to any number of other possible causes, such as the declining economy) had caused the Whites' alleged damages.

The parties thereafter submitted closing briefs and presented closing arguments on December 1, 2006. The following day, counsel for both parties stated on the record that they had received a fair opportunity to present their cases; and thus at that point, presumably, they thought their presentations were finished. Two days later, however, the panel—through a letter from Kowalsky—ordered the parties to submit further briefing "on the causation element of [the Whites'] fraud claims." Kowalsky also ordered the Whites to submit a "detailed accounting" of their damages.

Kinkade was unhappy about Kowalsky's letter because it gave the Whites another chance to fix what Kinkade thought were the most obvious weaknesses of the Whites' case—namely, their threadbare proof of causation and damages. So Kinkade objected to the letter, pointing out that Kinkade had briefed and argued both issues throughout the arbitration, whereas the Whites had largely ignored them. But the panel did not act on Kinkade's objections before the additional briefs were due, so the parties submitted them as directed.

At that point, for Kinkade, the real troubles began—for then the Whites and persons associated with them began showering Kowalsky's law firm with new business. First, on February 8, 2007, Kowalsky informed the parties that the Whites' appointed arbitrator, Morganroth (or more directly his attorneys), had hired one of Kowalsky's partners, Brad Schram, as a defense expert in a malpractice case then pending against Morganroth. Schram testified that he expected the fees for this engagement to be "substantial." Schram Dep. at 29. Kowalsky himself signed the retention letter on behalf of Schram.

Less than eight weeks later, on April 3, 2007, Kowalsky announced that David White—one of the actual parties to the arbitration—had hired another of Kowalsky's partners, Gary Saretsky, to represent White in an unrelated NASD arbitration. Kowalsky assured the parties that he would prevent himself from obtaining any information about the NASD arbitration—which was beside the point, since the subject of that arbitration had nothing to do with the subject of this one—but Kowalsky notably did not make any "effort to separate himself from the financial benefits that would accompany the representation." D. Ct. Op. at 6.

Thus, in late April 2007, Kinkade faced the following situation: Nearly five years and 50 hearing days into an arbitration already checkered by irregularities, its adversary in the arbitration and its adversary's appointed arbitrator, in the space of about eight weeks, had both retained the neutral's law firm for engagements that any litigator would have regarded as lucrative. Kinkade objected to those engagements in a letter two weeks later to the American Arbitration Association (AAA). In a response dated May 2, 2007, the AAA cryptically informed the parties that Saretsky had backed out of representing White in the NASD arbitration. Saretsky left Kowalsky's firm shortly thereafter.

Per the AAA's directions to counsel, Kowalsky himself was not copied on any of Kinkade's objections with respect to his firm's arrangements with White and Morganroth. But the Whites' attorney, Zawideh, blew that cover in a June 14 email to Kowalsky, in which he told Kowalsky that he had been "re-confirmed" as a neutral

arbitrator in the case.  As a result, Kinkade believed (as anyone would) that Kowalsky would surmise that one of the parties had objected to his firm's arrangements with White and Morganroth—and that the objector was Kinkade.  Kinkade also believed that Kowalsky would resent the objection.

Consequently, on July 2, 2007, Kinkade filed a motion with the AAA seeking to disqualify Kowalsky outright.  The motion recited in great detail the relevant facts of the arbitration, and argued that Kowalsky's disqualification was required under the AAA rules, the AAA Code of Ethics, California law (which both parties agree governs the case), the California Ethics Standards, and the ABA Model Rules.  Kinkade concluded its motion this way:

> Mr. Morganroth[] has sought the expert witness services of Mr. Kowalsky's partner, Mr. S[c]hram.  There must be hundreds if not thousands of lawyers in the State of Michigan who are as qualified as Mr. Schram to opine on any issue affecting the malpractice action against Mr. Morganroth and his law firm and, yet, Mr. Morganroth ends up with Mr. Kowalsky's partner *and Mr. Kowalsky approves*.  Similarly, there must be hundreds if not thousands of lawyers in the State of Michigan who are as qualified as Mr. Saretsky to represent Mr. White in an NASD arbitration and, yet, Mr. White ends up seeking the representation of Mr. Kowalsky's partner and, again, *Mr. Kowalsky approves*.  This all happened at the very moment Mr. Morganroth is acting as Mr. Kowalsky's co-arbitrator and Mr. White is appearing as a litigant before him.  How can the AAA possibly tolerate this conduct and, at the same time, call itself a "standard setter" that will always "follow the law?"

The AAA denied Kinkade's motion.  Kinkade then submitted a demand for disqualification directly to Kowalsky, which he denied.

Meanwhile, the arbitration itself began to move forward again.  The Whites had neglected to include any documents or other evidence in support of the damages calculations that they had submitted pursuant to Kowalsky's direction back in December 2006—an omission normally fatal to a party that bears the burden of proof as to its claim. But Kowalsky gave the Whites a chance to remedy that omission on July 6, 2007, when he ordered them to provide backup for their damages calculations.  They did so on August 9, with an 8,800-page production of financial records relating to the actual

operation of the Whites' galleries. Those documents—statements, invoices, checks, ledgers for the galleries, and so on—were exactly the kinds of documents that Kinkade had requested four years earlier and that, in response, the Whites had said did not exist. (The documents also showed that the Whites had made cash payments to six fact witnesses, ranging from $5,000–$10,000.) Kinkade therefore objected to the documents' admission and moved to bar the Whites from relying upon anything but their damages expert as to causation and damages. Kowalsky denied the motion.

On May 9, 2008, the panel issued an "Interim Award." The award was conclusory, stating as to each claim merely that the proofs did or did not "support[] recovery[.]" The Award found that the Whites had proved five of their claims, and awarded them $567,300 in damages. The Award denied recovery on Kinkade's breach-of-contract claim for paintings that the Whites had not paid for—notwithstanding that the claim was virtually uncontested. The Award further stated that "[a]ll claims that are not expressly granted are hereby denied." Arbitrator Ansell dissented on numerous grounds, including that Kinkade had been denied a fair hearing by the panel.

But the Interim Award did not give the Whites everything they asked for. The Whites had requested an award of attorneys' fees in their January 2008 closing brief to the panel, and the Award had not granted them any; so by the terms of the Award ("[a]ll claims that are not expressly granted are hereby denied") Kinkade thought that claim had been denied. That conclusion was buttressed by another fact: the Award had directed each party to submit a list of "costs and sanctions claims" that it thought remained pending, and the Whites' list did not include a claim for attorneys fees. But Kowalsky apparently thought otherwise: on June 3, 2008, he ordered the parties to submit applications for "fees and costs." Kinkade objected, arguing that an award of fees to the Whites would modify the Interim Award in violation of AAA rules, and separately that the Interim Award was untimely.

On February 26, 2009—again over Ansell's dissent—the panel majority issued a Final Award. The Final Award granted the Whites $487,000 in attorneys' fees, $215,846.20 in costs, and $258,121 in prejudgment interest. The Final Award nicked

the Whites $25,000 for withholding their financial records and another $75,000 for the internet-feed scheme. About Kinkade's pending objections, the Award had nothing to say. All told, the Whites' net award exceeded $1.4 million.

The next day, Kinkade filed a petition to vacate the Final Award in federal district court in Detroit. Kinkade later filed a motion seeking the same relief. In a 21-page opinion that canvassed the arbitration's history and the relevant law, the district court vacated the Final Award in its entirety.

This appeal followed.

## II.

We review for clear error the district court's factual findings and de novo its resolution of questions of law. *Uhl v. Komatsu Forklift Co., Ltd.*, 512 F.3d 294, 303 (6th Cir. 2008).

The Federal Arbitration Act authorizes federal courts to vacate arbitration awards on certain specified grounds. *See* 9 U.S.C. § 10. Among those grounds is "evident partiality or corruption in the arbitrators[.]" *Id.* § 10(a)(2). That is the ground upon which the district court vacated the award here.

To establish evident partiality, the challenging party must show that "a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 328 (6th Cir. 1998) (internal quotation marks omitted). "This standard requires a showing greater than an appearance of bias, but less than actual bias"; and to meet it, a party "must establish specific facts that indicate improper motives on the part of the arbitrator." *Id.* at 329 (internal quotation marks omitted).

Here, Kinkade established a convergence of undisputed facts that, considered together, show a motive for Kowalsky to favor the Whites and multiple, concrete actions in which he appeared actually to favor them. To begin with the motive: nearly five years into this arbitration, and in the space of eight weeks, the purportedly neutral

arbitrator's law firm—of all the law firms that practice commercial litigation in Michigan—was hired by one party's arbitrator-advocate (Morganroth) and then again by that same party (David White) for engagements that by all appearances would be substantial.

Kowalsky's actions only added to the concern. He gave the Whites a second and then a third chance to bolster the proofs for their claims. He allowed the Whites to rely upon 8,800 documents they had deliberately and wrongfully withheld for more than four years. He denied Kinkade any relief on a straightforward breach-of-contract claim that was virtually uncontested during the hearings. (David White admitted receiving the subject paintings and not paying for them. *See* D. Ct. Op. at 19.) Kowalsky failed to offer any response to serious objections that Kinkade had raised to his decisions as an arbitrator. And Kowalsky awarded the Whites nearly $500,000 in attorneys' fees after the plain terms of the Interim Award indicated that the Whites' request for fees had been denied. These actions, when combined with the late-arbitration dealings between the Whites and Kowalsky's firm, are more than sufficient to show his evident partiality.

It is no answer to assert, as the Whites do at length in their briefs to our court, that Kowalsky fully disclosed these arrangements to the parties. Five years into an arbitration, those disclosures were little better than no disclosure at all. On this point the district court's opinion was particularly thoughtful: "One major benefit of arbitration is that it allows parties to exercise some control over who will resolve their disputes." D. Ct. Op. at 16. Disclosures at the outset of an arbitration allow a party to reject an arbitrator as ethically encumbered as Kowalsky was here; and Kinkade obviously would have rejected Kowalsky out of hand if David White and Morganroth had hired Kowalsky's firm just prior to this arbitration rather than five years in. Thus, we entirely agree with the district court that, "[w]hen the neutral arbitrator engages in or attempts to engage in mid-arbitration business relationships with non-neutral participants, it jeopardizes what is supposed to be a party-structured dispute resolution process." *Id*. at 15–16.

Then there is the dilemma that the disclosures created for Kinkade. We can hardly improve upon the summary of Kinkade's counsel, Dana Levitt, in his May 9, 2007 objection to the AAA:

> [O]nce the disclosure was made the harm was done regardless of the outcome. The disclosure put our clients in the awkward position of either objecting to or appearing to approve the representation by the neutral arbitrator's firm of a party adverse to our client in another arbitration. If we object, we run the risk of offending the neutral; if we don't object, we appear to condone a clear conflict. We should never have been put in this position.

A party who pays a neutral arbitrator to prepare for, and then sit through, nearly 50 days of hearings over a five-year period, deserves better treatment than this.

Nor did it help matters that Saretsky called off his representation of David White after Kinkade objected to it. Kowalsky presumably did not welcome the change, given that he stood to benefit financially from the representation; and thus Kinkade had good reason to think that Kowalsky would resent Kinkade for scuttling it.

The district court's judgment is affirmed.