*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0456p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

NATIONWIDE MUTUAL INSURANCE COMPANY,
                                            *Plaintiff-Appellant,*

                    *v.*                                         No. 04-4344

HOME INSURANCE COMPANY,
                                            *Defendant-Appellee.*

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 03-00933—Edmund A. Sargus, Jr., District Judge.

Argued: September 13, 2005

Decided and Filed: November 29, 2005

Before: CLAY, GIBBONS, and GRIFFIN, Circuit Judges.

---

### COUNSEL

**ARGUED:** Michael L. Cohen, COHEN & BUCKLEY, Baltimore, Maryland, for Appellant. Philip J. Loree Jr., CADWALADER, WICKERSHAM & TAFT, New York, New York, for Appellee. **ON BRIEF:** Michael L. Cohen, COHEN & BUCKLEY, Baltimore, Maryland, Randolph Carson Wiseman, Stephen C. Gray, BRICKER & ECKLER, Columbus, Ohio, for Appellant. Philip J. Loree Jr., Clifford H. Schoenberg, CADWALADER, WICKERSHAM & TAFT, New York, New York, Gerald P. Ferguson, VORYS, SATER, SEYMOUR & PEASE, Columbus, Ohio, for Appellee.

---

### OPINION

---

        GRIFFIN, Circuit Judge. Plaintiff Nationwide Mutual Insurance Company ("Nationwide") appeals a district court order denying its application for vacatur of a final arbitration award issued in this reinsurance dispute with defendant Home Insurance Company ("Home"). For the reasons set forth below, we affirm the judgment of the district court confirming the award.

I.

        This long-running dispute originated in 1995, when Nationwide filed suit against Home for breach of a reinsurance contract that the parties had originally entered into in 1977. The district court referred the parties to arbitration pursuant to the terms of an arbitration clause in the reinsurance agreement. Numerous interim decisions of the arbitration panel were thereafter challenged in the district court, and, in fact, this is the fourth time this matter has come before the

Sixth Circuit for review. The extensive procedural history and involvement of this Court is found at *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 150 F.3d 545 (6th Cir. 1998) (*Nationwide I*); *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 278 F.3d 621 (6th Cir. 2002) (*Nationwide II*); and *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 330 F.3d 843 (6th Cir. 2003) (*Nationwide III*). The facts are succinctly set forth in detail in these prior opinions and will not be reiterated here except to the extent necessary to dispose of the issues presented on this appeal.

After this Court's decision in *Nationwide III*, the parties proceeded to the third phase of arbitration, culminating in a merits hearing. On July 17, 2003, the three-member arbitration panel[1] rendered its unanimous final decision which, in pertinent part, awarded Home the sum of $1,250,000 in costs and interest.[2]

Nationwide filed suit in district court to vacate the final award and two interim rulings rendered by the arbitration panel. In the alternative, Nationwide sought vacation of the interim rulings and Paragraphs 9 and 11 of the final decision granting Home's request for recovery of its

---

[1]This was the second arbitration panel to be appointed in this matter, following the resignation of the initial panel members. *See Nationwide III*, 330 F.3d at 844-45.

[2]The complete text of the panel's final decision states as follows:

1. Contract R is a contract of reinsurance.

2. The Addendum to Contract R, by necessary inference, imposed on Home a duty to supervise Rutty's inward and outward claim handling in respect of Nationwide's fixed pool share only but not a duty to otherwise replace Nationwide in the runoff or to fund Rutty.

3. In relation to Nationwide's fixed pool share of inward and outward claims, Home and Rutty agreed to deal only with each other. In relation to all other matters, Nationwide retained responsibility to supervise Rutty.

4. Home had a duty to pay accounts within a reasonable time from receipt. In that regard, Home also had the right to make reasonable inquiries and conduct reasonable inspections.

5. In exercising those rights and fulfilling those duties, Home was obligated to act in good faith and with fair dealing.

6. Although many of Home's queries and inspections were appropriate and legitimate, others were excessive and inappropriate. Likewise, many of Home's claim payments were timely but others were not. To the extent that some queries and inspections were excessive, and to the extent that some claim payments (including the Excess claim) were untimely, they constituted breaches of duty by Home.

7. Home's breaches of duty did not amount to bad faith.

8. Nationwide has failed in most respects to sustain its burden of demonstrating specific damages flowing from specific breaches by Home. The Panel nevertheless believes that some damage necessarily resulted from Home's breaches, and concludes in its discretion that it would be wrong to deprive Nationwide of any recovery at all. We accordingly award to Nationwide the sum of $750,000 in respect of Home's breaches of duty.

9. Home is awarded the sum of $1,250,000 in respect of its counterclaims for administrative costs and interest.

10. Nationwide is awarded a contribution from Home of $500,000 toward Nationwide's costs.

11. Home is awarded a contribution from Nationwide of $1,250,000 toward Home's costs.

12. All other claims and counterclaims between the parties are dismissed.

"fronting share administrative costs" (FSAC) and part of its costs in the arbitration.  Home opposed the vacatur application and sought confirmation of the final order.

On September 24, 2004, the district court issued an opinion and order denying Nationwide's vacatur application, granting Home's cross-motion for confirmation of the arbitration award, and entering a final judgment in favor of defendant Home Insurance.

Nationwide now appeals the district court's denial of its vacatur application, primarily on the ground of evident partiality based on an arbitrator's alleged nondisclosure of certain business and social relationships with Home.

## II.

The Federal Arbitration Act ("FAA") expresses a presumption that arbitration awards will be confirmed.  9 U.S.C. § 9; *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 328 (6th Cir. 1998).  "When courts are called on to review an arbitrator's decision, the review is very narrow; one of the narrowest standards of judicial review in all of American jurisprudence." *Nationwide II,* 278 F.3d at 625 (quoting *Lattimer-Stevens Co. v. United Steelworkers*, 913 F.3d 1166, 1169 (6th Cir. 1990)).  "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987).  Thus, "[a] federal court may vacate an arbitration award only in very limited circumstances." *Nationwide III*, 330 F.3d at 845.  "Those circumstances include 'where the arbitrators exceeded their powers,' 9 U.S.C. § 10(a)(4), and where the arbitrators act with 'manifest disregard for the law.'" *Id.* (quoting *Dawahare v. Spencer,* 210 F.3d 666, 669 (6th Cir. 2000)).  In addition, an arbitration award may be vacated upon application of any party to the arbitration "where there was evident partiality or corruption in the arbitrators, or either of them."  9 U.S.C. § 10(a)(2).  When reviewing a district court's denial of a motion to vacate an arbitration decision, we accept the court's findings of fact, unless clearly erroneous, and consider questions of law de novo. *Nationwide II*, 278 F.3d at 625; *Dawahare,* 210 F.3d at 669.

## III.

### A.

In the district court, Nationwide sought to vacate the final award of the second arbitration panel on the ground that the Home-appointed arbitrator, Ronald Jacks, displayed evident partiality contrary to subsection 10(a)(2) of the FAA, 9 U.S.C. § 10(a)(2).  Nationwide also alleged that Jacks engaged in improper *ex parte* contacts with one of Home's attorneys and with employees of ACE/INA Holdings, Inc., and CIGNA Corporation ("ACE/CIGNA").[3]  Specifically, Nationwide alleged that during the course of arbitration Jacks failed to disclose certain business and social relationships with Home and its counsel.[4]  Relying on *Apperson v. Fleet Carrier Corp.*, 879 F.2d 1344, 1358 (6th Cir. 1989), *cert. denied* 495 U.S. 947 (1990), which held that evident partiality will be found only where a reasonable person would have to conclude that an arbitrator was partial to

---

[3]In 1983, Home sold part of its business, including the reinsurance contract at issue, to CIGNA (now ACE), which performed its obligations to Nationwide through a subsidiary, AISUK.  *See Nationwide III*, 330 F.3d at 844-45.

[4]In June 2002, Jacks, one of Home's attorneys, and their wives had dinner to celebrate a birthday.  Jacks also had contact with one or two ACE employees concerning a recent arbitration in which ACE had appointed him as a mediator.  In June 2002, he also had a very brief conversation, apparently about the weather and politics, with ACE's CEO at the School of Risk Management's annual New York dinner.

one party to the arbitration, the district court concluded that Nationwide's claims of evident partiality were unfounded.

Nationwide now contends that, in assessing the effects of Jacks' alleged nondisclosures, the district court applied the wrong standard. Nationwide urges this Court to limit application of the *Apperson* standard to so-called "actual bias" cases, where the evident partiality claim is based on facts known or disclosed and objected to by the challenging party prior to or during the arbitration. Citing *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968),[5] Nationwide maintains that the fact of the nondisclosure alone mandates vacatur under either a "reasonable impression of bias" or "appearance of bias" standard. We disagree.

In *Apperson*, this Court, addressing allegations of "evident partiality" in the context of the arbitration of a labor contract dispute,[6] adopted the objective test utilized by the Court of Appeals for the Second Circuit in *Morelite Construction Corp. v. New York City Dist. Council Carpenters Benefit Funds*, 748 F.2d 79, 84 (2d Cir. 1984), in which the Second Circuit held that evident partiality "will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration."[7] *Id.* at 84 *(*quoted in *Apperson,* 879 F.2d at 1358). We also accepted *Morelite's* rejection, as dicta, of the appearance of bias standard espoused in the plurality opinion in *Commonwealth Coatings. Apperson,* 879 F.2d at 1358 n.19.

Consequently, "[u]nder *Apperson*, the party seeking invalidation must demonstrate more than an amorphous institutional predisposition toward the other side; a lesser showing would be tantamount to an 'appearance of bias' standard." *Andersons, Inc.*, 166 F.3d at 329. "The alleged partiality must be direct, definite, and capable of demonstration, and 'the party asserting [it] . . . must establish specific facts that indicate improper motives on the part of the arbitrator.'" *Id.* (quoting *Consolidation Coal Co. v. Local 1643, United Mine Workers of Am.*, 48 F.3d 125, 129 (4th Cir. 1995)).

We have since reiterated and followed the *Apperson* standard in *Nationwide II,* 278 F.3d at 626; *Dawahare,* 210 F.3d at 669; and *Andersons*, *Inc.*, 166 F.3d at 329. We conclude that the present circumstances do not warrant deviation from *Apperson's* case-by-case objective inquiry into

---

[5]In *Commonwealth Coatings*, a divided court addressed the issue of "evident partiality." A neutral arbitrator failed to disclose that he had engaged in periodic and significant business relationships with the successful party to the arbitration, including services related to the subject of the arbitration, and had been paid approximately $12,000 by the party in consulting fees. 393 U.S. at 146. The Court held that the arbitrator's failure to disclose this information justified vacating the arbitration award for evident partiality. *Id.* at 146-149. In so holding, Justice Black, writing for a plurality of four justices, indicated that arbitrators, like judges, must avoid even the "appearance of bias." *Id.* at 150. Justice White, joined by Justice Marshall, concurred in the result, but declined to hold that arbitrators are to be held to the standards of judicial decorum of Article III judges, or indeed of any judges. *Id.* Justice White opined that "[t]his does not mean the judiciary must overlook outright chicanery in giving effect to their awards"; however, "it does mean that arbitrators are not automatically disqualified by a business relationship with the parties before them if both parties are informed of the relationship in advance, or if they are unaware of the facts but the relationship is trivial." *Id.* at 150. Consequently, a majority of the Court did not endorse the "appearance of bias" standard set forth in the plurality opinion. *See Apperson*, 879 F.2d at 1358 n.19.

[6]Although the FAA exempts labor contracts from its purview, the *Apperson* Court looked to the FAA for guidance and utilized the "evident partiality" standard of subsection 10(a)(2) [formerly subsection 10(b)] in reviewing the bias claims. *Apperson*, 879 F.2d at 1353 n.9, 1358.

[7]The *Morelite* court, "[m]indful of the trade-off between expertise and impartiality, and cognizant of the voluntary nature of submitting to arbitration," interpreted evident partiality "as requiring a showing of something more than the mere 'appearance of bias' to vacate an arbitration award," yet not as insurmountable as "proof of actual bias." 748 F.2d at 83-84.

evident partiality, particularly where, as here, the complaint of evident partiality concerns a party-appointed, as opposed to a neutral, arbitrator. *Accord, Sphere Drake Ins. Ltd. v. All Am. Life Ins. Co.*, 307 F.3d 617, 620-23 (7th Cir. 2002); *Delta Mine Holding Co. v. AFC Coal Prop., Inc.*, 280 F.3d 815, 821-22 (8th Cir. 2001); *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 759 (11th Cir. 1993); *Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 679-80, 683 (7th Cir. 1983).

The arbitration agreement in this case requires that the arbitrators come from within the insurance industry and further provides for a tripartite panel consisting of two party-appointed arbitrators and one neutral umpire. *See Nationwide Mut. Co. v. Home Ins. Co.*, 90 F. Supp. 2d 893, 901-02 (S.D. Ohio 2000). Thus, as the district court noted, the parties clearly agreed to submit their claims to panel members who are involved in the business of insurance.[8] "The most sought-after arbitrators are those who are prominent and experienced members of the specific business community in which the dispute to be arbitrated arose. Since they are chosen precisely because of their involvement in that community, some degree of overlapping representation and interest inevitably results." *Int'l Produce, Inc. v. A/S Rosshavet*, 638 F.2d 548, 552 (2d Cir. 1981).

Home's party-appointed arbitrator, Ronald Jacks, who is the focus of the present case, has extensive experience serving as an international reinsurance arbitrator, a fact noted by the Seventh Circuit in *Sphere Drake*, 307 F.3d at 619, when it addressed a claim of evident partiality against Jacks in another unrelated reinsurance arbitration. The Seventh Circuit overturned the district court's finding of evident partiality based on Jacks' alleged failure to fully disclose that he had acted as counsel for a subsidiary of a party to the arbitration in an unrelated matter four years earlier. In so holding, the court held that Jacks' status as a party-appointed arbitrator on a tripartite panel was of particular significance:

> Industry arbitration, the modern law merchant, often uses panels composed of industry insiders, the better to understand the trade's norms of doing business and the consequences of proposed lines of decision. *See* Lisa Bernstein, *Private Commercial Law in the Cotton Industry: Creating Cooperation Through Rules, Norms, and Institutions*, 99 Mich. L. Rev. 1724, 1728 (2001). The more experience the panel has, and the smaller the number of repeat players, the more likely it is that the panel will contain some actual or potential friends, counselors, or business rivals of the parties. *Yet all participants may think the expertise-impartiality tradeoff worthwhile;*

---

[8] As the Seventh Circuit aptly observed in *Merit Insurance Co.*, 714 F.2d at 679:

The different weighting of impartiality and expertise in arbitration compared to adjudication is dramatically illustrated by the practice whereby each party appoints one of the arbitrators to be his representative rather than a genuine umpire. *See* Note, *The Use of Tripartite Boards in Labor, Commercial, and International Arbitration*, 68 Harv.L.Rev. 293 (1954). No one would dream of having a judicial panel composed of one part-time judge and two representatives of the parties, but that is the standard arbitration panel, the panel Leatherby chose – presumably because it preferred a more expert to a more impartial tribunal – when it wrote an arbitration clause into its reinsurance contract with Merit.

If Leatherby had wanted its dispute with Merit resolved by an Article III judge (to whom it had access under the diversity jurisdiction), it would not have inserted an arbitration clause in the contract, or having done so move for arbitration against Merit's wishes. Leatherby wanted something different from judicial dispute resolution. It wanted dispute resolution by experts in the insurance industry, who were bound to have greater knowledge of the parties, based on previous professional experience, than an Article III judge, or a jury. "The parties to an arbitration choose their method of dispute resolution, and can ask no more impartiality than inheres in the method they have chosen." Cf. *Am. Almond Products Co. v. Consol. Pecan Sales Co.*, 144 F.2d 448, 451 (2d Cir. 1944) (L. Hand, J.).

> *the Arbitration Act does not fasten on every industry the model of the disinterested generalist judge.*

*Id.* at 620 (emphasis added).

The *Sphere Drake* court, acknowledging these industry practices and the fact that "only *evident* partiality, not appearances or risks, spoils an award," *id.* at 621, concluded that Jacks' prior engagement did not demonstrate evident partiality within the meaning of § 10(a)(2):

> Let us suppose that the district judge's inferences are sound – that Jacks spent two months of equivalent full-time service as counsel for Sphere Drake in an international insurance arbitration, four years before the unrelated arbitration with All American. Even if Jacks had been the umpire, this would not have implied "evident partiality." Indeed, Jacks could have served as a federal judge in this case without challenge on grounds of partiality, and the scope of disqualification under § 10(a)(2) is considerably more confined than the rule applicable to judges.

*Id.*

The *Sphere Drake* court further held that, even assuming arguendo that Jacks had not adequately disclosed the extent of his involvement in the prior, unrelated proceedings, this nondisclosure alone did not demonstrate evident partiality:

> *Commonwealth Coatings* did not hold . . . that disclosure is compulsory for its own sake, and its absence fatal even if the arbitrator meets judicial standards of impartiality . . . . Nor did *Commonwealth Coatings* so much as hint that party-appointed arbitrators are governed by the norms under which neutrals operate. The point of *Commonwealth Coatings* is that the sort of financial entanglements that would disqualify a judge will cause problems for a neutral under § 10(a)(2) unless disclosure is made and the parties' consent obtained.

*Id.* at 623.

The Seventh Circuit's well-reasoned decision in *Sphere Drake* reinforces our conclusion that we should continue to adhere to the *Apperson* standard in this case, where evident partiality based on the alleged nondisclosure of material relationships by a party-appointed arbitrator is claimed. In formulating the objective standard now used by the Sixth Circuit, the *Morelite* court, like the Seventh Circuit in *Sphere Drake*, was cognizant of the practices and norms peculiar to industry arbitration and incorporated these considerations in its analysis. 748 F.2d at 83 ("[T]o disqualify any arbitrator who had professional dealings with one of the parties (to say nothing of a social acquaintanceship) would make it impossible, in some circumstances, to find a qualified arbitrator at all."). The rationale of *Sphere Drake*, which places an onerous burden of proof on the party alleging evident partiality of a party-appointed arbitrator, is entirely consistent with the *Apperson* standard, which likewise requires proof of circumstances "powerfully suggestive of bias." *Apperson*, 879 F.2d at 1358 (quoting *Merit Ins. Co.*, 714 F.2d at 681).

Given the arbitration format voluntarily chosen by the parties in this case, to permit vacatur based upon the mere "appearance of bias" of a party-appointed arbitrator "would be to render this efficient means of dispute resolution ineffective in many commercial settings." *Morelite,* 748 F.2d

at 84.[9]  We thus proceed to review Nationwide's allegations of evident partiality pertaining to arbitrator Jacks to determine whether a reasonable person would have to conclude that the arbitrator was partial to one party to the arbitration.

B.

During an October 1999 organization meeting with the arbitration panel, the panel members disclosed their contracts and connections with each other, the parties, and the parties' attorneys. Arbitrator Jacks, a retired lawyer, disclosed that he had no prior involvement with Nationwide, but stated that he had served as Home's arbitrator on six matters over twenty years, and as opposing arbitrator twice.  Jacks further stated that he had "served on a number of occasions in the last 20 years as a party arbitrator to CIGNA, and with regard to ACE, I represented ACE when . . . I was actively practicing law."  At the time of the arbitration, Jacks' law firm was outside general counsel for ACE, "but I have no continuing involvement in that representation."  He disclosed that he had been a party arbitrator for his firm's clients in eighteen arbitrations over a period of more than twenty years; he was opposing party arbitrator in three or four cases; he served as an umpire in two cases; and he was currently serving as an expert for one of their clients.  Jacks opined at that time that he would accept future engagements with ACE/CIGNA if he thought it was appropriate.

Over the next two years, no additional disclosures were made by the arbitrators.  In November 2001, Nationwide's attorney wrote the arbitrators requesting that each update their disclosures. Jacks promptly replied, noting his appointment as an arbitrator for ACE in an unrelated matter.  Nationwide did not object to Jacks' service at the time of the disclosure.  Further details of his involvement were sent by Jacks in January 2002 upon Nationwide's request.  Specifically, Jacks disclosed that he served approximately twenty times over a twenty-three year period as an arbitrator appointed by ACE or CIGNA.

Nationwide took no further action regarding Jacks' supplemental disclosures until after the United States District Court for the Northern District of Illinois issued its decision in *Sphere Drake*, finding evident partiality on the part of Jacks in an unrelated arbitration.  *Sphere Drake Ins. Ltd. v. All Am. Life Ins. Co.*, No. 01-C-5226, 2002 WL 1008464 (N.D. Ill. May 17, 2002).[10]  Nationwide readily acknowledges that it was prompted by the district court's decision in *Sphere Drake* to make further inquiries in the present case concerning Jacks.  In July 2002, Nationwide's attorney sent Jacks more detailed questions about his relationship with ACE/CIGNA and the compensation he had received from them over a twenty-year period.  Jacks' prompt response noted that from 1979 to date he had participated in over 100 arbitrations between insurers and reinsurers; he had acted as a party-appointed arbitrator for ACE/CIGNA in twenty cases, three of them still pending; since 1985, he had served as a party arbitrator for and against Home in six matters; and, while actively practicing law, he was not a billing partner at his firm for any legal work he did for ACE/CIGNA.  Jacks declined to disclose the amount of total compensation he received from his prior participation in matters involving Home and ACE/CIGNA.  At a September 2002 organizational meeting, Nationwide agreed to continue with the arbitration under a reservation of rights.  Nationwide subsequently raised the issue of arbitral bias in the district court proceedings below, and also alleged

---

[9]Nationwide cites *Olson v Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 51 F.3d 157 (8th Cir. 1995); *Schmitz v. Zilveti,* 20 F.3d 1043 (9th Cir. 1994)*;Middlesex Mut. Ins. Co. v. Levine*, 675 F.2d 1197 (11th Cir. 1982); and *Positive Software Inc. v. New Century Mortgage Corp.*, 337 F. Supp. 2d 868 (N.D. Tex. 2004), for the proposition that the mere fact of nondisclosure establishes an appearance of bias and, hence, evident partiality.  These cases, however, are inapposite, either involving neutral arbitrators or different governing rules of arbitration, and, to the extent that these cases endorse an appearance or reasonable impression of bias standard, they conflict with *Apperson*.

[10]As previously noted, the Seventh Circuit ultimately reversed the district court's decision. *Sphere Drake*, 307 F.3d at 617.

that there were improper *ex parte* social contacts on the part of Jacks with Home's counsel and employees.

These facts would not, in our opinion, lead a reasonable person to conclude that Jacks was partial to one side of the arbitration.  As the district court noted, this is not even a case of nondisclosure, as Nationwide argues; rather, Jacks made full and timely disclosures regarding his business relationship with Home and ACE/CIGNA.  These disclosures were not deficient, and Nationwide otherwise has failed to show with specificity how the substance of these disclosures pertaining to Jacks' continued service in the reinsurance industry, and his prior and ongoing contacts with Home and ACE/CIGNA in numerous unrelated matters, manifest evident partiality pursuant to 9 U.S.C. § 10(a)(2) and are "powerfully suggestive of bias" in the present matter.

We likewise agree with the district court that Jacks' social engagements did not constitute improper or prohibited *ex parte* contacts.  These events did not involve any communication regarding the Nationwide-Home arbitration.  Certainly, arbitrators and attorneys frequently participate in activities that result in communication unrelated to the subject matter of litigation before the arbitrator, *Morelite*, 748 F.2d at 83, and it would be unreasonable to suggest such contacts in unrelated matters are prohibited.

We therefore conclude, on the basis of the above record, that the district court did not clearly err in denying Nationwide's application for vacatur based on the allegations of evident partiality on the part of arbitrator Jacks.

IV.

In a related argument, Nationwide contends that it had a contractual right to withdraw its consent to the second panel's authority because Jacks' disclosures rendered him unacceptable to Nationwide, and, having purported to do so, the second panel acted in excess of its authority contrary to 9 U.S.C. §10(a)(4) when it rendered the final award.  Nationwide's argument lacks merit.

First, as the district court properly held, because Jacks' disclosures were not in fact deficient, Nationwide's contention that the second panel somehow exceeded its authority in continuing to hear the arbitration is baseless.  Second, the contractual provision which purportedly legitimizes such withdrawal in fact merely preserves the right of either party to seek the vacation of the arbitration panel's award except as to fully disclosed and accepted conflicts of interest.[11]  The provision does not sanction the unilateral withdrawal of support for the panel that would effectively dismantle the

---

[11]Nationwide bases its argument on language found in the Hold Harmless Agreement, whereby both parties agreed that neither would hold the arbitration panel members liable in connection with their arbitration service.  At the conclusion of the agreement, the following language appears:

Nothing in this stipulation, however, shall abridge any rights the Petitioner and Respondent may have with respect to each other to seek the vacation . . . of any . . . Award which the Panel may render except in regard to any conflicts of interest fully disclosed to the parties at the Organization Meeting, or thereafter and accepted by the parties.

(J.A. at 471, 473-74, 530.)

Nationwide alleges that this final exception language, for which it specifically negotiated, gives Nationwide the right to withdraw upon the subsequent disclosure of any arbitrator conflict for which Nationwide withholds its approval.  Nationwide's argument is contrary to both the language and the context of the clause.  The clause merely reserves Nationwide's normal rights to seek vacatur of the arbitration award, while circumscribing those rights somewhat by disallowing either party to seek vacatur on the grounds of conflict of interest, when such a contention is premised on a conflict fully disclosed and agreed to by the parties.

ongoing arbitration process. Accordingly, Nationwide could avail itself of no governing contractual right to withdraw its consent to the second panel's authority.

V.

Finally, Nationwide contends that the second arbitration panel exceeded its authority when it issued, as part of the final award, "fronting share administrative costs" ("FSAC") to Home. Pursuant to the terms of the underwriting agreements for the participants of the Rutty pool,[12] Rutty agreed to underwrite risks on behalf of each pool member. The pool members were each responsible for a percentage of pool liabilities in exchange for the same percentage of pool revenues. The percentage was fixed annually and was referred to as each pool member's "fixed quota share." The pool members could also act as fronting companies, whereby the cedents and insureds of the pool would receive contracts issued in the name of one or more pool members but not in the name of all pool members. Consistent with the terms of the underwriting agreements, however, the actual risks and premiums were still divided among the pool members based on each pool member's fixed quota share. Consequently, because the contracts between the insureds and cedents of the pool and the issuing companies did not include some pool members, the contingent liability of the fronting companies to the insured or cedent was almost always higher than their respective fixed quota shares.

Nationwide contends that, pursuant to the underwriting agreements, the pool was administered solely on the basis of each pool member's fixed quota share; thus, the panel's award to Home for its FSAC costs falls outside the ambit of the reinsurance contract.

Nationwide's argument is one of arbitrability. As previously noted, the FAA, 9 U.S.C. § 10, provides for limited judicial review of arbitration awards. The burden of proving that the arbitrators exceeded their authority is great. *Nationwide III*, 330 F.3d at 846. If a dispute is even arguably within the scope of an arbitration clause, the dispute is arbitrable. *See United Paperworkers Int'l Union,* 484 U.S. at 38.

We have previously characterized the arbitration clause in this reinsurance contract as a "broad" one. *Nationwide I*, 150 F.3d at 547. Home's claim for FSAC costs falls squarely within the scope of this broad clause. The issue of fronted share liability was initially raised before the arbitration panel by Nationwide, not Home, when Nationwide argued to the panel that Home's administrative duty under the reinsurance contract extended to Nationwide's fronted share. During the second phase of arbitration, the panel concluded to the contrary and held that Home's duty extended only to Nationwide's fixed pool share liability. Home continued to insure Nationwide's fronted liability under a reservation of rights while the issue was pending before the panel. During the third phase of arbitration, the panel issued a "duty ruling," incorporated in its final decision, in which it held that Home owed Nationwide a duty of care, good faith and fair dealing only in conjunction with the administration of the fixed pool share. The panel thereafter awarded Home the FSAC costs it incurred in acting on Nationwide's behalf when it was under no obligation to do so.[13] This award was entirely consistent with the duty ruling and certainly was an arbitrable issue that originated in Nationwide's claim regarding fronted share costs. The arbitration panel therefore did not exceed its authority in awarding such costs.

---

[12]See *Nationwide I*, 150 F.3d at 546.

[13]Home filed counterclaims seeking approximately $1,700,000 for costs incurred in administering Nationwide's fronted liability and $370,000 in interest on balances Home advanced on Nationwide's behalf for payments Home made to Nationwide's cedents on contracts Nationwide fronted for the pool.

Nationwide's argument that vacatur is warranted as to the remaining costs and expenses awarded to Home by the arbitration panel is similarly without basis in the record. Arbitrators are not required to explain their decisions. *Dawahare*, 210 F.3d at 669. In this complex and prolonged arbitration, we will not second-guess this aspect of the panel's award absent any compelling justification to do so.

## VI.

For the foregoing reasons, we affirm the district court's order denying Nationwide's vacatur application, granting Home's cross-motion for confirmation of the arbitration award, and entering final judgment in favor of defendant Home Insurance Company.