# GREENWALD

v.

# SHAYNE et al.

2009-Ohio-3384.]

Court of Common Pleas of Ohio,
Franklin County, Civil Division.

No. 08CVG–11–16119.

Decided April 28, 2009.

Porter, Wright, Morris & Arthur, L.L.P., Robert W. Trafford, and Matthew D. Crumpton, for plaintiff Gary D. Greenwald.

Zagrans Law Firm L.L.C., and Eric H. Zagrans, for defendant, counter-claimant and third-party plaintiff Stanley H. Shayne.

Schottenstein, Zox & Dunn Co., L.P.A., John P. Gilligan, and Jeremy M. Grayem, for third-party defendant Donald B. Leach Jr.

Tucker, Ellis & West, L.L.P., Harry D. Cornett Jr. and Benjamin C. Sassé, for third-party defendants Buckingham, Doolittle & Burroughs, L.L.P., et al.

---

Frye, Judge.

## I. Introduction

{¶ 1} Gary D. Greenwald and Stanley H. Shayne were law partners for many years. Their written partnership agreement included a clause calling for arbitration of any dispute in accordance with American Arbitration Association rules. After their partnership dissolved and Greenwald moved his law practice to Arizona, they made a supplemental contract to select someone from Columbus who had high-level experience in law-firm management as a single arbitrator. Following investigation, an arbitrator was hired. Following a four-day hearing, their arbitrator issued a decision. Some months later, that arbitrator—a partner in charge of the Columbus office of a multi-city firm—moved with over 20 other lawyers to practice at the Columbus office of a different firm. When that occurred, Shayne cried "foul" and sued to void the ten-month-old arbitration award, while also seeking money damages from the arbitrator. Adding insult to injury for the arbitrator's former firm, it too was sued. This opinion sorts through many of the legal questions all of this presents.

## II. Factual Background

{¶ 2} Greenwald and Shayne each held a 50 percent share in their law partnership. It dissolved in October 2006, and since early 2007, Greenwald has practiced law in Arizona. Significant disputes persisted, so the partners made a detailed new agreement to arbitrate matters involving both Shayne & Greenwald (their law firm) and Greenwald & Shayne Real Estate Company (which apparently owned their firm's downtown Columbus office building). The "Arbitrator Selection Agreement Between Gary D. Greenwald and Stanley H. Shayne" was effective in February 2007.

{¶ 3} Shayne and Greenwald agreed that their arbitrator should have a special kind of experience: a practicing lawyer in Franklin County currently serving, or who had served in the past, as the managing partner of a law firm or as partner in charge of the Columbus office of a law firm. In due course, Donald B. Leach Jr. was selected. At that time, he was in charge of the Columbus office of Buckingham, Doolittle & Burroughs ("Buckingham, Doolittle"), a multi-city firm whose main office historically has been in Akron. Leach accepted appointment in April 2007. In doing so, he represented in writing that after making a conflict check he was aware of no reason why he could not serve in the Shayne–Greenwald matter. Leach also mentioned prior professional dealings with attor-

neys at Shayne & Greenwald, but that he never interacted with Shayne or Greenwald individually.

{¶ 4} An arbitration hearing was held in September 2007. Leach issued a seven-page decision on November 12, 2007. In part, this case must determine whether that decision should be enforced or instead should be vacated. Shayne contends that he got the worst of Leach's decision, so he initially filed a civil action in September 2008 seeking to vacate it. However, a few weeks later, he dismissed that case, purportedly pursuant to Civ.R. 41(A), Ohio's general voluntary-dismissal provision. Greenwald filed this action a few weeks later, just before the one-year anniversary of the arbitration award, and sought court enforcement of it pursuant to R.C. Chapter 2711. Shayne responded by once more seeking to have the decision vacated and, in addition, sought damages against Leach individually and his now former law firm Buckingham, Doolittle. Shayne's theory is essentially that the arbitrator breached obligations of disclosure imposed in the arbitrator-selection agreement, because while deciding the case in 2007, Leach may already have been contemplating leaving Buckingham, Doolittle (as ultimately he did in June 2008). By leaving his own firm, the argument runs, Leach violated his fiduciary duty to Buckingham, Doolittle in a manner comparable to the way Greenwald breached duties he owed to Shayne. Hence, Shayne concludes, arbitrator Leach should have disclosed that he was predisposed before ruling on partnership issues between Shayne and Greenwald. The issues are collected in voluminous pleadings and briefs argued to this court in March 2009.[1]

{¶ 5} Shayne and Greenwald were both very experienced lawyers in 2007 when they made their postdispute arbitrator-selection agreement.[2] Their partnership had lasted more than 12 years. The agreement is a sophisticated legal document reflecting that both parties had counsel assisting with postpartnership issues.

---

1. {¶ a} On November 10, 2008, Greenwald filed an "Application for an Order Confirming Arbitration Award and Entry of Judgment Thereon." The arbitration award dated November 12, 2007, signed by Leach as arbitrator, was attached as Exhibit "D" to it.

   {¶ b} Greenwald moved to dismiss Shayne's new counter-claim. Third party-defendant Leach moved for judgment on the pleadings on all claims asserted against him by Shayne. Buckingham, Doolittle followed suit seeking dismissal of all claims asserted by Shayne. Numerous additional briefs have been filed, and an oral hearing (which Shayne attended) was held. While a good case can be made that third-party practice is not permitted in special proceedings concerned with enforcing or vacating an arbitration award, it has been pointed out that dismissal on that procedural basis would simply invite a new lawsuit and delay ultimate resolution of all parties' issues. Recognizing all parties are represented in this case and that other, dispositive arguments have been fully briefed, it is appropriate to resolve things now. See Civ.R. 1(B) and 61.

2. The court takes judicial notice from the Columbus Bar Directory that Shayne was admitted to practice in 1969, and Greenwald was admitted two years later.

{¶ 6} The arbitrator-selection agreement set forth an elaborate procedure to select a neutral person to hear their disputes. Each side was required to propose five arbitrators having the specific law firm management qualifications discussed earlier. Then, both parties could strike some lawyers proposed by the other side while rank-ordering the rest. The prospective arbitrator having the highest mutual ranking was first invited to interview. The agreement obligated all potential arbitrators to disclose "any circumstance that is likely to affect his or her impartiality or independence with respect to the merits of the dispute." Furthermore, the agreement contemplated that beyond information received directly from prospective arbitrators, material about them would be gathered from other sources such that after all the investigation, either partner could "require invitation of the next ranked person from the choices originally submitted by and to each other."

{¶ 7} Over and above these precautions, the parties included a procedure to address disclosures that might arrive only after appointment of their arbitrator. New "information that would impair his or her impartiality or independence or otherwise disqualify him or her" offered a basis for either Shayne or Greenwald to serve a notice to disqualify within seven days, or to proceed despite such new information. Death, resignation, or other potential difficulties with an arbitrator also were addressed.

{¶ 8} The parties incorporated provisions of the Ohio arbitration act by reference into their agreement, relative to their ability to subpoena witnesses and documents, and other procedural matters.

{¶ 9} Leach signed the last page of the Arbitrator Selection Agreement on April 27, 2007, under the caption "Arbitrator's Acceptance of Agreement." He acknowledged in doing so, "I accept appointment as arbitrator pursuant to the terms of the Agreement set forth above, together with such other terms with respect to compensation as shall be set forth in a separate letter."

{¶ 10} Shayne's answer, counter-claim and third-party complaint described "[t]he principal disputes between the parties" during arbitration as Shayne's claim that Greenwald breached his fiduciary duty, misappropriated business assets, and slandered Shayne, plus "related claims." Shayne further described his issues as "Greenwald's secret plotting for months to desert his partnership with Shayne and move to Phoenix," Greenwald's "solicitation and diversion of the law firm's significant clients to * * * Greenwald's anticipated new firm [in Phoenix]," and Greenwald's "slander" of Shayne's personal and professional reputation "to misappropriate those clients' business."

{¶ 11} Shayne's leading complaint about arbitrator Leach is that his decision "was adverse to Shayne in several material respects" causing Shayne monetary losses "in excess of One Million Dollars." Beyond that, Shayne pleads that in

June 2008—"seven months after the Decision"—news reports were published "revealing that Leach and his fellow Columbus office partners in the Akron-based BDB law firm would be deserting BDB on July 1, 2008 to join the Columbus Office of" another multi-city law firm. "Leach was quoted in the article, which noted that he would become the managing partner of * * * [his new firm's] Columbus office." In fact, Shayne alleges, a few days later Buckingham, Doolittle sued Leach and his fellow Columbus office partners "for breach of their fiduciary duties of loyalty * * * conversion, unfair competition * * * and other claims 'arising out of a pattern of disloyal conduct' (the 'BDB Complaint')."

{¶ 12} The timing of the Shayne & Greenwald arbitration proceeding in 2007 vis á vis arbitrator Leach's "nearly identical" alleged misconduct involving Buckingham, Doolittle is addressed by Shayne's pleading at several other places. Beyond his acknowledgment that public disclosure did not occur until mid-June 2008, Shayne asserts that Buckingham, Doolittle filed a lawsuit a few days later and pleaded that Leach and his Columbus colleagues "plotted 'over the past few months' * * * to take BDB's entire Columbus office and central Ohio practice to a competing law firm." Later, Shayne says, he "learned and hereby alleges on information and belief, that Leach expressed to others his dissatisfaction with the BDB firm as early as July 2007, and that Leach held clandestine meetings in the Autumn of 2007 with representatives of at least one other law firm in Columbus to discuss deserting the BDB law firm and taking clients away from BDB." Shayne pleads no hard facts to more specifically tie down dates when Leach became "dissatisfied" with Buckingham, Doolittle, much less how, or when, he acted upon any such feeling.

### III. *Shayne's Request to Vacate the Arbitration Decision*

{¶ 13} In response to Greenwald's request to confirm the arbitration award pursuant to Ohio law, Shayne seeks to vacate it, claiming, in short, that arbitrator Leach "was not in fact impartial and independent as was required because he was at all material times personally engaged in the very same type of activities that were the subject of Shayne's claims against Greenwald." According to Shayne, it was "against Leach's own personal interest to render a decision in favor of Shayne on the merits." Those facts, Shayne argues, were not learned until well after the arbitration was completed, although Leach had retained some residual authority to make further rulings needed in the wind-up of these businesses. Leach never held further hearings or otherwise acted in the matter after 2007, however. Thus, the mere fact that on paper Leach retained some residual arbitration authority has no significance in determining whether Shayne acted in a timely manner in seeking to set aside the one decision that Leach actually rendered.

{¶ 14} R.C. Chapter 2711 is the exclusive source of procedures under which parties may seek to confirm or vacate an arbitration award. *Galion v. Am. Fedn. of State, Cty. & Mun. Emp., Ohio Council 8, AFL–CIO, Local 2243* (1995), 71 Ohio St.3d 620, 646 N.E.2d 813, paragraph two of the syllabus. Someone seeking to vacate an award must act within a narrow three-month window of time after the decision is delivered. The Ohio Supreme Court has held that a "trial court lacks jurisdiction" if an application to vacate, modify, or correct an award is filed outside that period. *Galion,* at 622, 646 N.E.2d 813. "The jurisdiction of the courts to review arbitration awards is narrow and limited pursuant to legislative decree." *FIA Card Servs., N.A. v. Wood,* 7th Dist. No. 08–JE–13, 2009-Ohio-1513, 2009 WL 825414, at ¶ 7; see also *Citibank South Dakota, N.A. v. Wood,* 169 Ohio App.3d 269, 2006-Ohio-5755, 862 N.E.2d 576, at ¶ 25. Furthermore, the Franklin County Court of Appeals has held that R.C. 2711.13 demands not only the filing of papers with a court within three months, but also that they "be served upon the adverse party or his attorney within three months after the award." *Thomas v. Franklin Cty. Sheriff's Office* (1998), 130 Ohio App.3d 153, 156, 719 N.E.2d 977. Additionally, Ohio law permits vacation of an award only in limited circumstances. As the Supreme Court has recognized, "the vacation, modification or correction of an award may only be made on the grounds listed in R.C. 2711.10 and 2711.11, and then only when the application therefor is made by a party within the time allowed under R.C. 2711.13, i.e., three months. The jurisdiction of the courts to review arbitration awards is thus statutorily restricted; it is narrow and it is limited." (Footnote omitted.) *Warren Edn. Assn. v. Warren City Bd. of Edn.* (1985), 18 Ohio St.3d 170, 173, 480 N.E.2d 456.

{¶ 15} Roughly ten months after Leach issued his decision, Shayne first sought to vacate it. Shayne voluntarily dismissed that case, and in doing so cited Civ.R. 41(A)(1)(a). He then re-filed after Greenwald brought this case to confirm the award. Two questions are presented. First, it must be determined whether the three-month limitation period in R.C. 2711.13 can be tolled or extended until "discovery" of Leach's alleged lack of independence as might occur with ordinary statutes of limitation; a second inquiry is whether Shayne's dismissal of his original case precludes renewal of the effort to vacate the award in this subsequent case.

### A. The Discovery Rule and Equitable Tolling

{¶ 16} Shayne filed his first challenge to Leach's decision long after the three-month statutory period had run. Nevertheless, he argues that his opportunity to vacate the award is not time-barred because the discovery rule, or principles of equitable tolling, extended the three-month limitations period in R.C. 2711.13. Shayne's premise is that this carefully selected arbitrator masterfully concealed his own lack of impartiality and independence. Among other

decisions, Shayne relies upon *Doe v. Archdiocese of Cincinnati*, 109 Ohio St.3d 491, 2006-Ohio-2625, 849 N.E.2d 268, for the generic proposition that a discovery rule or equitable tolling may apply when facts are fraudulently concealed. However, *Doe* and cases like it addressed different statutes and distinguishable circumstances.

{¶ 17} Tolling for a fraudulent concealment of misconduct by an arbitrator, or until alleged misconduct has been "discovered," has never been applied to the three-month period provided by R.C. 2711.13. This provision has been termed "the three month statutory time limit." *FIA Card Servs.*, 2009-Ohio-1513, 2009 WL 825414, at ¶ 14. Even the "three-day rule" for mailing a pleading that is otherwise permitted by Civ.R. 6(E) has been held to be inapplicable in this context. *Citibank South Dakota*, 2006-Ohio-5755, at ¶ 26. References to this "mandatory * * * statute of limitations" in *Galion*, certainly suggest that no exception to the three-month time requirement is available on any basis including even the late discovery of factual matters relative to an arbitrator's partiality or business interests. Apart from the statutory language in R.C. 2711.13 and such judicial references to it, a well-reasoned appellate decision squarely rejected these arguments. *Beck Suppliers v. Dean Witter Reynolds, Inc.* (1988), 53 Ohio App.3d 98, 101, 558 N.E.2d 1187.

{¶ 18} "It is well-settled that Ohio and federal courts encourage arbitration to settle disputes." *Gordon v. OM Fin. Life Ins. Co.*, 10th Dist. No. 08AP–480, 2009-Ohio-814, 2009 WL 441977, at ¶ 7. An often-cited reason for why the law favors arbitration is that it is more expeditious than the public court system. In determining an appropriate time frame for seeking to vacate an arbitration award, therefore, it must be kept in mind that "[p]arties 'trade the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration.'" *14 Penn Plaza L.L.C. v. Pyett* (2009), 556 U.S. ——, 129 S.Ct. 1456, 1471, 173 L.Ed.2d 398. Furthermore, "[v]irtually every study considering the issue has concluded that results in arbitration are far swifter than those in litigation. * * * Thus, for those claimants who desire speedy resolution of their claims (whether for financial reasons, psychological ones or others), arbitration is far superior." Rutledge, Whither Arbitration? (2008) 6 Georgetown Jl. Law & Pub. Policy 549, 571. It would undermine the key goal of expediency if arbitration awards could be attacked indefinitely. Despite the superficial attraction of a rule protecting against undisclosed misconduct by an arbitrator, defendant Shayne's argument raises the prospect of substantial delay in finalizing, or setting aside, arbitration decisions. Accordingly, consistent with *Beck Suppliers*, this court also holds that the three-month time limit in R.C. 2711.13 may not be extended even by belated discovery of alleged misconduct of the arbitrator. The opportunity to substantially prolong a legal dispute with such collateral argu-

ments must, practically speaking, be viewed a feature of ordinary litigation surrendered in arbitration.

{¶ 19} Several decisions are said by Shayne to recognize that federal arbitration statutes can be extended using equitable tolling. Those do not reflect the Ohio statute and obviously are distinguishable on that basis alone. Moreover, the most recent decision cited, *Bauer v. Carty & Co., Inc.* (C.A.6, 2007), 246 Fed.Appx. 375 (not published), did not address tolling a limitations period. That decision was confined to determining whether clear and convincing evidence of a substantive basis to vacate an award existed, rather than whether the proceeding to do so was timely. Having a substantive basis in law to vacate an award is completely separate from the threshold issue of whether one is procedurally time-barred from seeking such relief. The other federal decisions referred to by defendant either do not recognize tolling, or are factually distinguishable. Accordingly, the court holds that Shayne's original lawsuit seeking to vacate Leach's decision was untimely when filed in September 2008; the court need not address Greenwald's alternative argument that even if the discovery rule or tolling applied Shayne's request to vacate the award must fail because it was only filed—and not served—within three months following discovery. See *Thomas v. Franklin Cty. Sheriff's Office*, 130 Ohio App.3d 153, 719 N.E.2d 977.

### B. Civ. R. 41(A) Did Not Permit a Voluntary Dismissal

{¶ 20} At oral argument, Shayne contended that his voluntary dismissal without prejudice of that first effort to vacate the arbitrator's decision keeps this second case in court. His argument is premised upon Civ.R. 41(A). Generally speaking, Civ.R. 41(A) and the Ohio "saving" statute in R.C. 2305.19(A) permit voluntary dismissal of an ordinary civil case even after the statute of limitations has expired, so long as the claim is re-filed within a year. E.g., *Presley v. Fraley*, 10th Dist. No. 08AP–767, 2009-Ohio-1558, 2009 WL 840551 at ¶ 12–15. Shayne argues that his effort to vacate the award is timely this second time around. However, leaving aside the fact that Shayne's first case was not timely, his approach glosses over the distinction between a "special proceeding" to enforce or vacate arbitration awards and practices available in ordinary civil lawsuits.

{¶ 21} Although long ago abolishing the distinction between suits in law and in equity (as recognized in Civ.R. 2), Ohio still recognizes a category of "special statutory proceedings" that is somewhat different from ordinary civil cases. Some special proceedings, such as administrative appeals, land condemnation cases, or those concerned with arbitration, rely more upon statutory rules than on generic court procedures in the Ohio Rules of Civil Procedure. Since 1970 when first promulgated pursuant to the Modern Courts Amendment to the state Constitution, the Civil Rules have explicitly acknowledged that distinction. Civ.R. 1(C). Sometimes, appellate decisions have been needed to sort out

alternative procedures provided by statute and rule. E.g., *Dir. of Hwys. v. Kleines* (1974), 38 Ohio St.2d 317, 67 O.O.2d 368, 313 N.E.2d 370 (procedure for consolidating land appropriation cases controlled by Civ. R. 42).

{¶ 22} R.C. 2711.10 has been held to create a special statutory proceeding. *Gen. Acc. Ins. Co. v. Ins. Co. of N. Am.* (1989), 44 Ohio St.3d 17, 22, 540 N.E.2d 266, citing *Gerl Constr. Co. v. Medina Cty. Bd. of Commrs.* (1985), 24 Ohio App.3d 59, 24 OBR 113, 493 N.E.2d 270, and the Staff Notes to Civ.R. 1(C). See also *Galion,* 71 Ohio St.3d at 623, 646 N.E.2d 813; *Buyer's First Realty, Inc. v. Cleveland Area Bd. of Realtors* (2000), 139 Ohio App.3d 772, 782, 745 N.E.2d 1069, and *Divine Constr. Co., Inc. v. Ohio–American Water Co.* (1991), 75 Ohio App.3d 311, 314, 599 N.E.2d 388.

{¶ 23} R.C. 2711.13 specifically refers to R.C. 2711.10, which sets forth the grounds for vacating an award. The right to seek vacation of an arbitration award is created by R.C. 2711.10 as limited by R.C. 2711.13. *Galion* at 622, 646 N.E.2d 813. "There is a fundamental distinction between a general statute of limitations and a special statutory limitation incorporated in and qualifying a particular right created by statute. * * * In essence, the 'Savings Statute' applies to general statutes of limitation which limit the remedy available for a particular right, known at common law, but does not apply where the time for bringing an action is part of the statutory right itself. * * * " *Jarvis v. Jarvis,* 8th Dist. No. 34810, 1976 WL 190935, at *1. Stated another way, "the conclusion is inescapable that the savings clause of Section 2305.19, Revised Code, does not apply to a cause of action created by statute which is unknown to the common law and which in terms contains its own statute of limitations." *Alakiotis v. Lancione* (1966), 12 Ohio Misc. 257, 261, 41 O.O.2d 381, 232 N.E.2d 663.

{¶ 24} Civ.R. 41(A) does not apply in the context of this type of special proceeding under R.C. Chapter 2711. Were the law otherwise, the three-month limitation period would be meaningless and could be extended to 15 months or more, undermining the expediency promised by arbitration. Hence, even if Shayne's initial case was timely, his voluntary dismissal of it was fatal.

### C. *Shayne Pleads No Legitimate Reason to Vacate the Award*

{¶ 25} Although Shayne's attack on arbitrator Leach's decision has been procedurally defaulted, some mention should be made of the substantial body of law developed around attacks, like this one, on the integrity of an arbitrator.

{¶ 26} R.C. 2711.10 allows an award to be vacated for various reasons, including "evident partiality or corruption" or "other misbehavior by which the rights of any party have been prejudiced" by an arbitrator. The comparable provision in the Federal Arbitration Act permits vacating an award "where there

was evident partiality or corruption in the arbitrators." Section 10(a)(2), 9 U.S.Code. Seeking to lay a foundation for such a serious charge, Shayne tries to bootstrap contract terms mentioning disclosures contained in the agreement that he and Greenwald made into a purported basis to find that Leach failed under R.C. 2711.10. Essentially, Shayne seeks to impose a continuing affirmative obligation upon Leach to divulge the most personal of his own affairs—his alleged subjective dissatisfaction with Buckingham, Doolittle, and any tangible steps he contemplated (or took) to leave the firm—as conditions for faithful service as an arbitrator.

{¶ 27} Closely examined, Shayne offers only threads of argument, not circumstances truly suggestive of partiality or other misbehavior actionable under R.C. 2711.10. The arguments ignore key, undisputed facts. Chief among them is the long delay between the arbitration hearing and decision in 2007 and Leach's actual change of law firm relationships in mid–2008. What ties the events together? Shayne relies upon speculation, hearsay, and inflammatory allegations made against Leach (and others) by Buckingham, Doolittle in its own lawsuit filed after the split; none are particularly credible here. Many people—even prominent lawyers—may become disenchanted with their jobs. They neither necessarily nor immediately embark upon leaving their employer, much less also abandon independent professional responsibilities.

{¶ 28} Shayne argues that merely by agreeing to the arbitrator-selection agreement, Leach accepted a "higher" duty of disclosure than would otherwise apply. However, statutes set forth all the bases for vacating an arbitration award, not a parties' arbitration contract. Federal courts have adopted an objective test in this circumstance in which only evident partiality, not merely superficial appearances or risks of it, spoil an award. Nondisclosure of peripheral matters unrelated to an arbitration do not meet that high standard even if an arbitrator neglects to disclose something. E.g., *Nationwide Mut. Ins. Co. v. Home Ins. Co.* (C.A.6, 2005), 429 F.3d 640, 644–647. Disclosure is not compulsory for its own sake, and its absence is not automatically fatal unless the stringent statutory grounds for setting aside an award also are met.

{¶ 29} Three practical reasons justify rejecting Shayne's speculative premise that once Leach became "dissatisfied" with his own law firm, or took any tangible step to change firms, that he committed misconduct as an arbitrator. First, recall that Shayne and Greenwald demanded an arbitrator directly involved in law firm management. Mobility of partners and associate lawyers between law firms is not a recent phenomenon. Accordingly, one must presume that in the past—or perhaps even while the Shayne and Greenwald arbitration was underway—Leach encountered professional issues of this sort as other lawyers proposed to join or leave Buckingham, Doolittle. The prospect of that sort of

professional experience was precisely why these parties hired Leach. So, just as that experience was not disqualifying in advance it surely could not be a ground to undo an arbitration that was over and done. Those like Leach, who are "[t]he most sought-after arbitrators are those who are prominent and experienced members of the specific business community in which the dispute to be arbitrated arose. Since they are chosen precisely because of their involvement in that community, some degree of overlapping representation and interest inevitably results. * * * *Yet all participants may think the expertise-impartiality tradeoff worthwhile; the Arbitration Act does not fasten on every industry the model of the disinterested generalist judge'.* (Emphasis added.) [*Sphere Drake Ins., Ltd. v. All Am. Life Ins. Co.* (C.A.7, 2002), 307 F.3d 617, 620]." *Nationwide Mut. Ins. Co. v. Home Ins.,* 429 F.3d at 646. Shayne cannot be heard to complain that it was unforeseen that law firm management issues arose for Leach while he was engaged in arbitrating, even if by coincidence such issues to some degree paralleled matters between himself and Greenwald.

{¶ 30} Second, given the length of time between the arbitration and Leach's actual change of law firm affiliation, an allegation of partiality premised upon general comparability of issues is not the direct, definite, and demonstrable factual showing required in this context. Arbitrators and judges (and perhaps also sports referees or umpires) make decisions for many reasons. Personal education and business experience are important, to be sure, but decisions also must mesh with the evidence heard, arguments of counsel, and rules of decision. In short, many factors tug at every decision-maker. To suggest that Leach betrayed his oath and slanted his decision in favor of Greenwald merely because Leach himself might have been dissatisfied with—or even actively disloyal to—his own law firm is not only speculative but also focuses upon only one of many factors necessarily involved in making a decision.

{¶ 31} The third practical reason to reject Shayne's arguments focuses squarely upon Leach's motivations, assuming he was dissatisfied and looking for a new law firm opportunity. If one accepts Shayne's premise that Leach hoped to change firms at exactly the time he was making this decision, then slanting the outcome would have been the last thing Leach predictably would have done. In a case of this magnitude in the local legal community, rendering a "bad" decision would have undermined Leach's reputation and likelihood of getting new work as an arbitrator—precisely the things that made Leach valuable to a new law firm. Seventh Circuit Judge Richard A. Posner is an astute observer of such things. He has recognized that "arbitrators who get a reputation for making mistakes will find it hard to get selected for future cases. * * * Arbitrators whose awards are repeatedly vacated by the courts will lose business because judicial invalidation of an award creates added delay, uncertainty, and expense for the parties,

who, remember, bear the entire cost of arbitration." Posner, How Judges Think (2008) 128–129. So, to follow Shayne's premise to its logical conclusion, if Leach was looking to leave Buckingham, Doolittle during 2007, then he predictably was *more* likely motivated to be scrupulously honest in rendering this decision and, thereby, enhancing his stature within the Columbus legal community. That behavior would attract more work and make him more attractive to a new firm. Slanting a decision in favor of Greenwald, who after all had already left the state, offered no predictable benefit to Leach whatsoever.

{¶ 32} *Commonwealth Coatings Corp. v. Continental Cas. Co.* (1968), 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301, is a landmark case on the subject of undisclosed background information involving an arbitrator. It recognized that when a third, supposedly neutral commercial arbitrator had an undisclosed, long-term business relationship with one party but never revealed it, there was a basis to vacate an award. Over the years since *Commonwealth Coatings* was decided, many state and federal decisions have examined this area of law to refine the criteria for vacating an award when such issues arise.

{¶ 33} *Gerl Constr.* took note of a decision almost 100 years ago, holding that "[i]f the interest of the arbitrator was too remote and contingent to induce any reasonable suspicion that it could have influenced his decision, the award will not be set aside." 24 Ohio App.3d at 62–63, 24 OBR 113, 493 N.E.2d 270. That statement continues to reflect Ohio law. *Miller v. Mgt. Recruiters Internatl., Inc.*, 8th Dist. No. 91114, 2009-Ohio-236, 180 Ohio App.3d 645, 906 N.E.2d 1162, followed *Gerl Constr.* earlier this year. It held that a violation of an American Arbitration Association "disclosure rule is not enough to require the vacating of the award." Id. at ¶ 13. Instead, "[c]ase law interpreting the statutes have concluded that more than an appearance of partiality is required. Direct evidence that the arbitrator was biased must be shown." Id. *Gerl Constr.* was also followed by the Franklin County Court of Appeals. *In re Furtado v. Hearthstone Condominium Assn.* (May 19, 1987), 10th Dist. No. 86AP–1003, 1987 WL 11606. "The mere imagination[,] appearance or suspicion of partiality is insufficient to establish under R.C. 2711.10(B) that there was 'evident partiality' on the part of the arbitrator." Id. at *2 (fact that arbitrator rented office space and shared a receptionist with one lawyer was not evidence from which partiality could reasonably be presumed or inferred). Another Ohio court held that when alleged bias is rooted in an arbitrator's relationship with a nonparty (like Leach's potential new law firm) "the relationship must be such that one could reasonably infer bias, not those which are peripheral, superficial, or insignificant. * * * The basis for the alleged bias must not be indirect, remote, or tenuous." *Shook, Inc. v. Corporate Interior Sys., Inc.*, 2d Dist. No. 19639, 2003-Ohio-2089, 2003 WL 1949797, at ¶ 15.

{¶ 34} In the federal courts, " ' "the party asserting evident partiality must establish specific facts that indicate improper motives on the part of the arbitrator." ' *Andersons* [*Inc. v. Horton Farms, Inc.* (C.A.6, 1998),] 166 F.3d [308,] 329 * * * (quoting *Consolidation Coal Co. v. Local 1643, United Mine Workers*, 48 F.3d 125, 129 (4th Cir.1995)). It is not enough to demonstrate 'an amorphous institutional predisposition toward the other side,' because that would simply be the appearance-of-bias standard that we have previously rejected. Id." *Uhl v. Komatsu Forklift Co., Ltd.* (C.A.6, 2008), 512 F.3d 294, 306–307. There are strong reasons why the law does "not rush to conclude that an arbitrator is evidently partial" because they "are often chosen for their expertise and community involvement." Id. at 308. As in *Uhl*, both Shayne and Greenwald "specifically contracted for [an] arbitrator[ ] with experience" in their specific niche of the legal marketplace "and while we cannot say how large that pool of arbitrators would be, if a relationship as insignificant as the one in this case were enough to trigger evident partiality, it would make it much harder to find arbitrators with the relevant and necessary expertise." Id. Similarly, in an en banc decision the Fifth Circuit recently held that "[a]n arbitrator's failure to disclose must involve a significant compromising connection to the parties" not something "trivial or insubstantial." *Positive Software Solutions, Inc. v. New Century Mtge. Corp.* (C.A.5, 2007), 476 F.3d 278, 282–283; see also *RDC Golf of Florida I, Inc. v. Apostolicas* (Fla.Dist.Ct.App. 5th Dist.2006), 925 So.2d 1082, 1093–1094 (also discussing state and federal decisions since *Commonwealth Coatings* ).

{¶ 35} Against the backdrop of this strict standard, Shayne nevertheless seeks discovery from Leach before the court confirms or vacates the award. Predictably, Leach's private thoughts relative to his law practice and any opportunities in other settings would be the subject of inquiry, focused not only upon the time when the Shayne and Greenwald arbitration was underway but also eight or ten months thereafter. Such discovery is not available. Consistent with the stringent standard that must be met to set aside an arbitrator's award, a heightened legal standard has developed that must be met before discovery is required from an arbitrator. It is either "clear evidence of improper conduct or [at least a lesser standard that will] simply establish that a reasonable person would have to conclude that an arbitrator was partial." *Uhl*, 512 F.3d at 308. " '[A]lthough it may be difficult to prove actual bias without deposing the arbitrators, depositions of arbitrators are "repeatedly condemned" by courts.' [*Woods v. Saturn Distrib. Corp.* (C.A.9, 1996), 78 F.3d 424, 430 ]. In the absence of clear evidence of impropriety, a party is not entitled to discovery by way of deposing one or more arbitrators. *Portland Gen. Elec. Co. v. U.S. Bank Trust Natl. Assn.*, 38 F.Supp.2d 1202 (D.Or., 1999). * * * The alleged partiality must be direct, definite, and capable of demonstration, and 'the party asserting evident partiality must establish specific facts that indicate improper motives on the part

of the arbitrator'. [*Andersons*, 166 F.3d] at 329." *Nationwide Mut. Ins. Co. v. Home Ins. Co.* (S.D.Ohio 2000), 90 F.Supp.2d 893, 899. Shayne's assertions justify no discovery.

{¶ 36} Accordingly, the first cause of action under Shayne's counterclaim and third–party complaint, seeking to vacate the arbitration award, is denied. The request of plaintiff Greenwald to confirm the decision of Leach is granted.

## IV. *Immunity of the Arbitrator*

{¶ 37} The claims remaining in Shayne's third-party complaint are for breach of contract, breach of fiduciary duty, and fraud. All are asserted against Leach and Buckingham, Doolittle. Counsel for Shayne stipulated on the record at oral argument that if legal immunity protected Leach, then no claim survives against Buckingham, Doolittle. There does not appear to be a genuine dispute of material fact relative to these claims, or other procedural reason that they are not appropriately addressed at this juncture.

{¶ 38} Under state and federal law, arbitrators are protected by a form of judicial immunity. The United States Supreme Court has recognized that "judicial immunity extended not only to public officials but also to private citizens (in particular jurors and arbitrators); the touchstone for its applicability was performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights." *Antoine v. Byers & Anderson, Inc.* (1993), 508 U.S. 429, 433, 113 S.Ct. 2167, 124 L.Ed.2d 391. "Courts have long recognized that public policy strongly favors arbitration, analogizing to the principles of judicial immunity to shape the contours of arbitral immunity to suit." *Garcia v. Wayne Homes* (April 19, 2002), Clark App. No. 2001 CA 53, 2002 WL 628619, * 15. See also *Buyer's First Realty*, 139 Ohio App.3d at 787, 745 N.E.2d 1069. Arbitrator immunity bars claims that an arbitrator failed to disclose a source of possible bias, like the claim advanced here by Shayne. *Pullara v. Am. Arbitration Assoc., Inc.* (Tx.App.2006), 191 S.W.3d 903, 907, and cases cited therein. Furthermore, "[a]rbitral immunity is not limited to individual arbitrators. It has been uniformly accepted that such immunity extends to arbitration associations * * *." *Garcia*, at ¶ 90. So, aside from the stipulation by Shayne, Leach's former law firm has derivative immunity here as a matter of law.

{¶ 39} Dismissal of all claims against Leach and his former law firm, and of the fifth cause of action under the counter-claim and third-party complaint which sought punitive damages, is granted.

## V. *Conclusion*

{¶ 40} Having considered the arguments of Shayne, the court finds that his request to vacate or modify the arbitration award under R.C. 2711.10 and 2711.11 was untimely. Pursuant to R.C. 2711.09, Greenwald's request to confirm the

award was proper and the court confirms the decision of Leach. For the reasons stated above, defendant/counter-claimant/third-party plaintiff Shayne's claims against Leach and Buckingham, Doolittle do not state a claim upon which relief can be granted.

It is so ordered.